**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

SEAN MURPHY                                          CA NO 20: 00694
ROBERT BARNES
DANIEL REALE

VS

NED LAMONT

**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR**
**TEMPORARY INJUNCTION**

### I. Preliminary Statement

The Plaintiffs respectfully and humbly pray for injunctive relief against

widespread and previously unknown levels of unconstitutional overreach by any

government in this State's history. These actions have amounted to a wholesale

violation of State law and wholesale usurpation of numerous State and Federal

Constitional provisions which have, effectively, placed Connecticut under one-man

rule. Said one-man ruler, the Defendant, has exercised powers never afforded to

him under any lawful authority, and powers that have even gone so far as to

entering Connecticut into an unconstitutional confederation with other States while

purporting to exercise soveriegn powers afforded only to the United States

government under the Constitution. Said one-man ruler has further, in usurping the

entire order and form of both State and Federal government, taken further actions

to outlaw virtually all normal daily associations of the Plaintiffs, restrict their

movement and arbitrarily reorder their lives into a scheme deemed appropriate

1

solely according to the Defendant's whim.

## II. The Facts

### A. The Unconstitutional Orders

This Constitutional Crisis began with the Defendant's declaration of emergency (Exhibit A), under color of State law, specifically, General Statutes §§19a-131a and 28-9, which he proclaims to last until September 9, 2020. It identified none of the Plaintiffs (as none of the orders that followed do). That declaration, which has never been modified or acted on in relation to the Plaintiffs by the Commissioner of Health, states, "...I hereby authorize and direct the Commissioner of Public Health to delegate the powers regarding isolation or quarantine to municipal and district directors of public health. Municipalities, local health officials, and local education officials are directed to follow previously issued guidance and apply relevant principles of risk management to decisions about whether to cancel, modify, or postpone large gatherings, public events, or travel. Orders regarding additional measures to protect public health and safety, including suspension or modification of specific statutes, will follow as I determine to be necessary..." §19a-131a(f) states, "(f) The commissioner may delegate to an employee of the Department of Public Health or any local health director, as much of the authority of the commissioner described in this section as the commissioner determines appropriate. Such authorized employee or director shall act as an agent of the commissioner." - not the Governor.

2

Using the words "ORDER AND DIRECT", the Defendant prohibited public gatherings of all kinds (Exhibit B). The Defendant then removed all open meeting requirements to public meetings (Exhibit C) and further limited all gatherings to no more than 50 while closing in peron restaurant operations, gyms and recreational facilities (Exhibit D). He closed places of large outdoor gatherings regardless of kind or type (Exhibit E). The Defendant proclaimed to have waived the requirement for service of process (agains himself in this case, and apparently all others), ordered State courts closed, suspended the right to speedy trial, suspended statutes of limitations, the time restrictions on arraignments, notices of sessions of the Superior Courts and all time and due process requirements for juvenile proceedings  - and then prohibited the operation of barberships and other 'non-essential' activities (Exhibit F).   The Defendant then proclaimed authority to decide which businesses could remain open and were essential, and eliminated non-essentials to reduce all staffing by 100% (Exhibit G). 7I claimed the first authority to rewrite Statutes and insert new sections, carte blance, while claiming authority mo modify Federal Law (HIPPA and Medicare), limiting visits to children in DCF custory, suspending in person requirements for hearings on municipal budgets, and requirements for hearings related to municipal appeals (Exhibit H). The Defendant then claimed unilateral authority to suspend all due process requirements related to involuntary psychiatric committment and interstate child custody matters (Exhibit I). The Defendant prohibited, carte blanche, all effective

3

cash and other transactions among 'non-essential' businesses (Exhibit J). Further committed to the wholesale reordering of society and without taking any of the Plaintiffs' individual situations or needs into consideration, the Defendant banned all gatherings of more than five (Exhibt K). Going further, the Defendant extended his societal lockdown to include State Parks, and without any reasonable or forseeable ability for municipalities to do so, ordered educational staff already laid off as a consequence of school closures re-hired). (Exhibit L) The Defendant then converted all open stores in this State into an ergomonic hellscape by ordering the flow, direction, spacing and moving of the individual Plaintiffs in public  - while impairing the obligation of all insurance contracts in this State while suspending all in person meeting requirements for municipal budgets. (Exhibit M). By order of the Defendant, the Plaintiffs may not rent hotel rooms (Exhibit N). The Defendant unilaterally imposed his will on all rental contracts and interfered with those obligations in the same order he continued the restrictions on the Plaintiffs' movement in public (Exhibit O). The Defendant's order that the Plaintiffs wear masks and restrict their flow of oxygen followed (Exhibit P). The Defendant struck down the right of the Plaintiffs to meet at Town Meeting for budget proceedings (Exhibit Q).

While prohibiting all classes of activities set forth in the Verified Complaint, none of them set forth any punishment, penalty or due process for adjudication of any of them, any factors a court would consider in ruling on them (assuming those

4

criminal courts were open) and imposing the very real threat of indefinite detention for violating them as all rights to speedy trial were purported to have been suspended by the Defendant.

B. <u>The Interstate Compact</u>

As set forth in the Verified Complaint, with articles and statements hyperlinked, the Defendant, with no lawful authority to do so, the Plaintiffs' State to an interstate compact and agreement ([https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/04-2020/Massachusetts-Joins-Connecticut-New-York-New-Jersey-Rhode-Island-Pennsylvania-and-Delaware](https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/04-2020/Massachusetts-Joins-Connecticut-New-York-New-Jersey-Rhode-Island-Pennsylvania-and-Delaware)) That compact was never approved by the Plaintiffs' Legislature nor the United States Congress. It spends and appropriates money derived by its member States. Its proceedings are secret. Said compact, including its actions to close the States to shipping and commerce in manners cumulative to executive orders 7, 7D and 7N, affect Plaintiff Barnes as the captain of a registered vessel (Exhibit S).

C. <u>The Result of the Defendant's Unlawful Usurpation of Government and Exercise of Power</u>

In essence, the Defendant has ended our State and Federal form of government within and even without Connecticut by decree. All liberties secured by our Constitution have been ended along with all societal, social, civic, political and religious life. The Defendant undertook no inquiry as to the Plaintiffs or provided them any notice or due process as required by CGS §19a-131b or the State or Federal Constitutions prior to or at any point he had issued his unlawful orders.

5

The orders render illegal religious worship, familial association, companionship and commerce of all kinds and classes  set forthin in the Verified Complaint.

Subsequent to the Defendants' Orders, the Wisconsin Supreme Court (Exhibit R) struck down such an approach in Wisconsin Legislature v Secretary-Designee Andrea Palm , et al (No. 2020AP765-OA ) (2020), stating that, "...the Governor's emergency powers are premised on the inability to secure legislative approval given the nature of the emergency. For example, if a forest fire breaks out, there is no time for debate. Action is needed. The Governor could declare an emergency and respond accordingly. But in the case of a pandemic, which lasts month after month, the Governor cannot rely on emergency powers indefinitely..." Id, 22-23. The Wisconsin Supreme Court continued, as to the issues created by their Governor, and ours, for the reasons that wide swaths of activities were made criminal:  "...Crimes created by the Legislature in statutes must have specificity in order to be enforceable. State v. Popanz, 112 Wis.2d 166,173,332 N.W.2d 750 (1983)(explaining that a "criminal statute must be sufficiently definite to give a person of ordinary intelligence who seeks to avoid its penalties fair notice of conduct required or prohibited"). Because Palm fails to understand the specificity necessary to a valid criminal statute, she also fails to understand that no less specificity is required of a rule to which criminal penalties are assigned." Id. 25. The Wisconsin Supreme Court then aptly quoted United States Department of Justice Guidance in its opinion: "There is no pandemic exception...to the fundamental

6

liberties the Constitution safeguards. Indeed, 'individual rights secured by the Constitution do not disappear during a public health crisis.' These individual rights, including the protections in the Bill of Rights made applicable to the states through the Fourteenth Amendment, are always in force and restrain government action." Id, 29.

Unlike Wisconsin, whose governor actually did direct the Commissioner of Public Health per Wisconsin law to take action, the Defendant did not. §19a-131a., the authority upon which the defendant relied to restrict the Plaintiffs' movements, gatherings, rights and liberties, states, "(a) In the event of a state-wide or regional public health emergency, the Governor shall make a good faith effort to inform the legislative leaders specified in subsection (b) of this section before declaring that the emergency exists and may do any of the following: (1) Order the commissioner to implement all or a portion of the public health emergency response plan developed pursuant to section 19a-131g; (2) authorize the commissioner to isolate or quarantine persons in accordance with section 19a-131b; (3) order the commissioner to vaccinate persons in accordance with section 19a-131e; (4) apply for and receive federal assistance; or (5) order the commissioner to suspend certain license renewal and inspection functions during the period of the emergency and during the six-month period following the date the emergency is declared to be over... The declaration shall state the nature of the public health emergency, the political subdivisions or geographic area subject to the

7

declaration...." As to the enforcement of any orders, of which only the

Commissioner (not the Defendant) may make, "The commissioner may request the

Attorney General to apply to the Superior Court for an order enforcing the

provisions of any order issued by the commissioner pursuant to sections 19a-131

to 19a-131i, inclusive, and such other equitable relief as the court deems

appropriate. (f) The commissioner may delegate to an employee of the Department

of Public Health or any local health director, as much of the authority of the

commissioner described in this section as the commissioner determines

appropriate. Such authorized employee or director shall act as an agent of the

commissioner." Id, which become impossible in light of Executive Order 7G and R,

closing both the Superior and Probate Courts.

### D. The Surge That Never Happened

This was all done by the Defendant without war, invasion, nuclear attack or

any reasonable belief or scientific inquiry that the Orders had any measurable,

quantifiable effect other than to bring the Constitution, the Laws of this State and

the Plaintiffs' liberties to an abrupt halt.

The hospital surge the initial 15 days to stop the spread was promoted to

address never came – neither did patients to hospitals for elective procedures and

routine screening for cancer and other illnesses that claim many hundreds of

thousands of Americans more than Dr. Fauci wrote in the New England Journal of

Medicine that COVID-19 would claim (See

https://www.nejm.org/doi/full/10.1056/NEJMe2002387) What also never came were the Plaintiffs' rights to notice and hearing under Connecticut General Statutes §19a-131b.

The Defendant has set this State on a deeply troubling course where executive authority may indefinitely reinvent society on its own, in perpetuity, claiming whaveter grave danger necessary to frighten its will into the color of law and give it the full force and effect of legislative power it was never granted.

Additional facts not apparent on the record will be discussed as required.

### III. The Law Requires Injunctive Relief

#### A. Standard for Issuance of Injunction

"Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies, which are 'never awarded as of right,' or 'as a routine matter.' "Whitfield v. Lopez, No. 15-CV-4827 (DLI) (LB), 2015 WL 6128866, at *2 (E.D.N.Y. Oct. 16, 2015) (citations omitted). "In the Second Circuit, where a party seeks preliminary injunctive relief...courts apply the four-factor test set forth by the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)." *Mrs. U.S. Nat. Pageant, Inc. v. Miss U.S. Org., LLC*, 875 F.Supp.2d 211, 226 (W.D.N.Y. 2012). Under this test, a district court must determine that a plaintiff has shown: (1) a likelihood of success on the merits; (2) that absent an injunction [the p]laintiff is likely to suffer irreparable injury that cannot be remedied with monetary damages; (3) that the balance of hardships tips

in favor of [the p]laintiff; and (4) that "the public interest would not be disserved" by the issuance of an injunction.

B. Due Process Violations in General

A substantive due process claim arises when a property owner alleges that the government has acted in an arbitrary and capricious manner. As noted by the Supreme Court, the Due Process Clause bars "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Daniels v. Williams*, 474 U.S. 327 (1986), *quoted in Zinerman v. Burch*, 494 U.S. 113 (1990).

A procedural due process claim arises when a state actor, as the Defendant did, deprives one of a property, life or liberty interest without any due process of law.[1]

C. Due Process Requirements to Restrict the Plaintiffs' Liberties Have Not Been Met

*1. Due Process, in the Context of §19a-131b*

The law is clear:

(a) Notwithstanding the provisions of section 19a-221 or 19a-265, if the Governor has declared a public health emergency, the commissioner, if so authorized by the Governor pursuant to section 19a-131a, may order into quarantine or isolation, as appropriate, any individual, group of individuals or

---

1 John Harrison, Substantive Due Process and the Constitutional Text, 83 VA. L.REV. 493, 497 (1997) (stating, "In their procedural aspect, the Due Process Clauses are understood first of all to require that when the courts or the executive act to deprive anyone of life, liberty, or property, they do so in accordance with established law .... Second, the Due Process  Clauses, as read procedurally,

require that judicial or executive processes follow fair procedures"). In the case of the Executive Orders of the Defendant, *they followed no procedures of any kind*.

individuals present within a geographic area whom the commissioner has reasonable grounds to believe to be infected with, or exposed to, a communicable disease or to be contaminated or exposed to contamination or at reasonable risk of having a communicable disease or being contaminated or passing such communicable disease or contamination to other persons if the commissioner determines that such individual or individuals pose a significant threat to the public health and that quarantine or isolation is necessary and the least restrictive alternative to protect or preserve the public health. No individual or group of individuals or individuals present in a geographic area shall be quarantined or isolated unless they meet the conditions in this subsection.

(b) The commissioner shall adhere to the following conditions and principles when quarantining or isolating individuals, groups of individuals or individuals present within a geographic area: (1) Quarantine and isolation shall be by the least restrictive means necessary to prevent the spread of a communicable disease or contamination to others and may include, but not be limited to, confinement to private homes or other private or public premises; (2) quarantined individuals shall be confined separately from isolated individuals; (3) the health status of quarantined or isolated individuals shall be monitored frequently to determine if they continue to require quarantine or isolation; (4) if a quarantined individual subsequently becomes infected or contaminated or is reasonably believed to have become infected with a communicable disease or contaminated, such individual shall be promptly moved to isolation; (5) quarantined or isolated individuals shall be immediately released when they are no longer infectious or capable of contaminating others or upon the order of a court of competent jurisdiction; (6) the needs of individuals quarantined or isolated shall be addressed in a systematic and competent fashion, including, but not limited to, providing adequate food, clothing, shelter, means of communication with those in quarantine or isolation and outside those settings, medication and competent medical care; (7) premises used for quarantine and isolation shall be maintained in a safe and hygienic manner and be designed to minimize the likelihood of further transmission of infection or other harms to individuals quarantined or isolated; (8) to the extent possible without jeopardizing the public health, family members and members of a household shall be kept together, and guardians shall stay with their minor wards; and (9) to the extent possible, cultural and religious beliefs shall be considered in addressing the needs of individuals and establishing and maintaining

premises used for quarantine and isolation.

(c) An order to quarantine or isolate issued by the commissioner shall be in writing and shall include: (1) The name of any individual, group of individuals or individuals present within a geographic area to be quarantined or isolated, or the geographic area where such communicable disease is present or contamination exists; (2) the basis for the commissioner's belief regarding the presence of a communicable disease or that contamination exists within the geographical area; (3) the period of time during which the order shall remain effective; (4) the premises subject to quarantine or isolation, that may include, but need not be limited to, private homes or other private or public premises; and (5) other terms and conditions as may be necessary to protect and preserve the public health. In determining the length of such order, the commissioner shall consider, to the extent known, the length of incubation of the communicable disease or contamination, the date of the individual's exposure and the individual's medical risk of exposing others to such communicable disease or contamination. The order shall be effective for not more than twenty days, provided further orders of quarantine or isolation meeting the requirements of this section may be issued as to any respondent for successive periods of not more than twenty days if issued before the last business day of the preceding period of quarantine or isolation..."

Connecticut General Statutes §19a-131b goes on on (d) requiring written notice of right to consult counsel and to a hearing. (e) of that statute affords a reasonable determination that the isolation be ended upon the Commissioner's determination the subject in isolation is no longer infectious. (f) provides for an appeal mechanism – the Probate Courts (which are closed). (g) requires a notice of hearing, and of a record to be made. (h) requires that the Plaintiffs not only have a right to be heard – but that they have access to records the Commissioner so relied upon to determine their isolation or quarantine to further public safety, and (k) requires that the isolation or quarantine end unless a finding of danger of

12

infection exists and is maintained. None of the needs of the Plaintiffs were taken into account for the purposes of §19a-131b(b), nor did the Commissioner ever issue an order isolating the Plaintiffs – yet the Executive Orders did.

The Defendant and others have caused to be published guidance from the CDC (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html) stating that, "COVID-19 is thought to spread mainly through close contact from person-to-person. Some people without symptoms may be able to spread the virus. We are still learning about how the virus spreads and the severity of illness it causes." (emphasis Plaintiffs'). The Defendant continues to cause to be reported not deaths and hospitalizations directly proven to be COVID-19 attributable (with no other preexisting conditions), but "For public health surveillance, COVID-19-associated deaths include persons who tested positive for the virus that causes COVID-19 disease around the time of death (confirmed) and persons whose death certificate lists COVID-19 disease as a cause of death or a significant condition contributing to death (probable)."(See https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary5172020.pdf?la=en) The Connectiuct Post had reported over 57% of COVID-19 associated deaths occured in nursing homes as of May 8, 2020. (https://www.ctpost.com/local/article/CT-nursing-homes-to-receive-coronavirus-

testing-15254996.php). New York Governor Andrew Cuomo, whose state is in the same unconstitutional confederation the Defendant associated Connecticut with, even noted to the press  of COVID-19 cases that, "If you notice, 18% of the people came from nursing homes, less than 1% came from jail or prison, 2% came from the homeless population, 2% from other congregate facilities, but 66% of the people were at home, which is shocking to us..."

(https://www.cnbc.com/2020/05/06/ny-gov-cuomo-says-its-shocking-most-new-coronavirus-hospitalizations-are-people-staying-home.html)

The Plaintiffs simply had no order or findings from the Commissioner of Public Health, nor do they have any data for "COVID-19 associated deaths" seperated from other morbidities that far more commonly take the lives of the vulnerable (such as stroke, heart attacks, falls or influenza) – nor can it be obtained because the Defendant has suspended access to Freedom of Information Act procedures and the State Courts. With COVID-19 understood to require only 14 days of isolation, and the Defendant's lockdown orders having continued for over two months, no other conclusion can be made that the deprivation of the Plaintiffs' rights is arbitrary, and void of both procedural and substantive due process.

### 2. Due Process in the Context of §28-9

As to the disposition of property, the operation of §28-9 of the General Statutes triggers §28-11. Rather than take any property defined, the Defendant instead reached well beyond that, impairing all insurance, rental and other

14

contracts and agreements, while commandeering virtually all aspects and classes of commerce and goods in this State – deciding which property and property interests are allocated or not, and what business may or may not transact. While essentially impounding and freezing all "non-essential" business, no account of this taking has been made or attempted to be made by the Defendant. §28-9(7), read in the clear, logical context of statutory intereration, maintains that, "The Governor may take such other steps as are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state, to prevent or minimize loss or destruction of property and *to minimize the effects of hostile action*." (*emphasis* Plaintiff's), noting the clear logical context that this scheme is not used to address disease, but rather enemy attack by enemies of the United States or of armed rebellion or riot. Accordingly, the Defendant's authority to issue the orders affecting the Plaintiffs could not lawfully have arisen there, in §28-9, which is only invoked, "In the event of serious disaster, enemy attack, sabotage *or other hostile action* or in the event of the imminence thereof..." (with emphasis)

Simply put, the Legislature did not ever intend §28-9 to apply to a public health crisis – or any other situation that did not involve a foriegn or domestic enemy.

C. <u>The Plaintiffs' Liberty Interests Are Protected, and Have Been Infringed</u>

The Defendant's conduct runs afoul of a gauntlet of well established First Amendment protected liberty interests.

15

*1. Political Speech and Civic Involvement*

The Orders emphatically ban and restrict all kids and classes of gatherings, including social, cultural, civil, religious and political. For brief example, the executive orders in limiting public gatherings, explicitly or implicitly, affect public parks. Parks are "quintessential public forums [where] the government may not prohibit all communicative activity." *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 45 (1983). The Orders in fact do – including and especially protest of the Defendant's unlawful, unconstitutional orders complained of in this Action. No matter what the reason for assembly on the public commons, "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. . . . Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) Even off the public commons – on private property no less, as Plaintiff Reale complains relating to his membership in the APA – that right is still an economic matter (APA charges dues to participate, which the Plaintiff has paid, and now cannot play).

.       Similarly, all the Plaintiffs have a right, so long as the business they are in does not establish a counter policy, to walk in whichever direction they please,

16

shake hands, and when ergonomically impossible, be within six feet of someone else. That has always been a choice between the Plaintiffs and the businesses with which they would associate – and have in fact been denied the right to associate – not the Defendant's.

## 2. Religious Worship

It has long been held that any government law that burdens religion violates the First and Fourteenth Amendments to the United States Constitution. See *Sherbert v Verner* 374 US 398 (1963). Numerous executive Orders (7D and 7N) are brazen in their attempt to do so ("...as well as religious, spiritual or worship gatherings of such size, are prohibited throughout the State of Connecticut...")

Many families' would-be baptisms are illegal. So are weddings. So are many confirmations. So is the operation of Sunday Schools. The Defendant simply did it all, and well past any authority in General Statutes §19a-131a and §28-9.

## 3. Familial and Other Intimate Relations

The Defendant's orders made it illegal for Plaintiff Reale, and many others, to visit family. The right to have close associations was very clearly decided in *Roberts v United States Jaycees* 468 U.S. 609 (1984). There, the Supreme Court noted, "Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the

17

role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties. The intrinsic and instrumental features of constitutionally protected association may, of course, coincide. In particular, when the State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association in both of its forms may be implicated." 617-618 Here, it very clearly is. The Defendant, in more than exceeding any lawful or constitutional authority and without hearing or due process, simply told the Plaintiffs they can't have freedom of association.

That association is being attacked on a daily basis by and under color of the Defendant's unlawful orders. Friends cannot exercise and play basketball. Couples have the police called on them for holding hands in public. Easter mass, and dinner, do not happen. The Defendant's unlawful orders are simply monstrous in that respect.

      D. <u>The Right to Home Rule Under Connecticut's Constitution Was Abrogated</u>

Connecticut's Constitution, Article X, states:

18

SEC. 1. The general assembly shall by general law delegate such legislative authority as from time to time it deems appropriate to towns, cities and boroughs relative to the powers, organization, and form of government of such political subdivisions. The general assembly shall from time to time by general law determine the maximum terms of office of the various town, city and borough elective offices. After July 1, 1969, the general assembly shall enact  no special legislation relative to the powers, organization, terms of elective offices or form of government of any single town, city or borough, except as to (a) borrowing power, (b) validating acts, and (c) formation, consolidation or dissolution of any town, city or borough, unless in the delegation of legislative authority by general law the general assembly shall have failed to prescribe the powers necessary to effect the purpose of such special legislation.

SEC. 2. The general assembly may prescribe the methods by which towns, cities and boroughs may establish regional governments and the methods by which towns, cities, boroughs and regional governments may enter into compacts. The general assembly shall prescribe the powers, organization, form, and method of dissolution of any government so established.

The Governor denied the Plaintiffs, electors of Southbury and Plainfield, respectively, the right to participate in their budget processes and municipal governments by suspending the form and method by which siad business is conducted – usurping the ability of the Plaintiffs by refering the matter, exclusively, to all city councils and boards of selectmen in this State.

It is immediately obvious what the Defendant has done to the Town Budget process, as one of many examples of how he has upended the local governments of the Plaintiffs. While the State of Emergency purports to only last until September 9, 2020, the Defendant has forced the Plaintiffs' towns into arbitrarily, unconstitutionally decided budgets (and any necessary borrowing decisions that

follow in the financial wake of all else the Defendant has done) for the next year. Of course, those Towns still want their car taxes from the Plaintiffs. Soutbury still wants property taxes from Plaintiff Murphy, who cannot sell his home because of the unalwful orders issued by the Defendant.

This entirely runs afoul of Connecticut's Home Rule Act. "The purpose [of the act] is clearly twofold: to relieve the General Assembly of the burdensome task of handling and enacting special legislation of local municipal concern and to enable a municipality to draft and adopta home rule charter or ordinance which shall constitute the organic law of the [municipality], superseding its existing charter and any inconsistent special acts. . . .The rationale of the act, simply stated, is that issues of local concern are most logically answered locally, pursuant to a home rule charter, exclusive of the provisions of the General Statutes. . . . Moreover, home rule legislation was enacted to enable municipalities to conduct their own business and [to] control their own affairs to the fullest possible extent in their own way. . . upon the principle that the municipality itself[knows] better what it want[s] and need[s] than . . .the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs.. . . Consistent with this purpose, a state statute cannot deprive [municipalities] of the right to legislate onpurely local affairs germane to [municipal] purposes.. . . Consequently, a general law, in order to prevail over a conflicting charter provision of a [municipality]having a home rule charter, must pertain to

those thingsof general concern to the people of the state . . . ." (Citations omitted;

internal quotation marks omitted.) *Board of Education v. Naugatuck*, 268 Conn.

295, 843 A.2d 603 (2004)

> E. The Defendant Has Acted in Violation of Article 1, §10 of the United States Constitution

> "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility... No State Shall, without the Consent of Congress... enter into any Agreement or Compact with another State..." US Const. Article 1 §10

> *1. Impairment of the Obligation of Contracts*

*Fletcher v. Peck*, 10 U.S. 87 (1810), very well settled law, concerned the

Georgia legislature's attempt to void land contracts that it had made in a previous

session. The United States Supreme Court held it unconstitutional, as it would the

Defendant's executive orders pertaining to rental and insurance contracts, among

many other matters. Absent injunctive relief to stop the Defendant from continuing

his efforts to reinvent all social and economic order by fiat, this Court should note

the very well settled purpose of the Contract Clause: "Following the Revolution,

and prior to the adoption of the Constitution, the American people found

themselves in a greatly impoverished condition. Their commerce had been well-

nigh annihilated. They were not only without luxuries, but in great degree were

destitute of the ordinary comforts and necessities of life. * * * The circulation of

depreciated currency became common." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290

U.S. 398, 454–455 (1934) (Sutherland, J., dissenting)

Absent injunctive relief, the Defendant's actions promise to return Connecticut to that very state of turmoil where there are no real obligations and where no planning or long term arrangements can be made by which neighbors and fellow citizens may enter into mutually beneficial arrangements.

### 2. The Agreement and Compact Clause

Article V §4 gaurantees each State a Republican Form of Government. Paramount to that are two fixed values: (1) the United States Constitution defining the framework for the relationship among the States, and (2) that no State may enter into any Agreement or Compact with another without the approval of the United States Congress.

The Plaintiffs have never voted in any election in which Governor Cuomo was a candidate, at any time. Yet, the Defendant has agreed to implement the same policies under pretense of emergency authority[2], nothing in which General Statutes §19a-131a or §28-9 have ever contemplated or the Legislature ever dreamed of them contemplating as evidenced by their clear language. The Supreme Court contemplated the meaning of what an interstate compact was in *Virginia v Tennessee*, 148 U.S. 503, 518 (1893):

> "Looking at the clause in which the terms "compact" or "agreement" appear, it is evident that the prohibition is directed to the formation of any combination tending to the increase of political power in the states, which

---

2 For example, the coordinated, identical policies of restrictions imposed on

the Plaintiffs and residents of other States in the Northeast:
https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/03-2020/Northeast-Governors-From-Connecticut-New-York-New-Jersey-Announce-Collective-Measures

> may encroach upon or interfere with the just supremacy of the United States. Story, in his Commentaries (§ 1403), referring to a previous part of the same section of the Constitution in which the clause in question appears, observes that its language "may be more plausibly interpreted from the terms used, 'treaty, alliance, or confederation,' and upon the ground that the sense of each is best known by its association (*noscitur a sociis*) to apply to treaties of a political character, such as treaties of alliance for purposes of peace and war, and treaties of confederation, in which the parties are leagued for mutual government, political cooperation, and the exercise of political sovereignty, and treaties of cession of sovereignty, or conferring internal political jurisdiction, or external political dependence, or general commercial privileges," and that "the latter clause, 'compacts and agreement,' might then very properly apply to such as regarded what might be deemed mere private rights of sovereignty, such as questions of boundary, interests in land situate in the territory of each other, and other internal regulations for the mutual comfort and convenience of states bordering on each other... In such cases, the consent of Congress may be properly required, in order to check any infringement of the rights of the national government..." Id., 147-148

This is such a case. The Defendant has taken actions well beyond those that concerned *Virginia vs Tennesee,* supra, (which concerned an agreement on border disputes). He has obligated public money to pay for a council determining how Connecticut and the other States will reopen, and to buy equipment that will be decided to be disbursed and in what way, among those States and in a manner decided by the Governors and their Council. The Compact does not respond or appear to be subject to Freedom of Information or Open Meeting requirements of any one particular State. The Defendant (and other member governors) intend that the policies of each State be identical and equally enforceable in all member

States. The Defendant has committed Connecticut without the authority of its Legislature, as has the governors of the other member States – all acting under color of emergency authority. This agreement is clearly political and clearly intends to wield political power for domestic peacetime purposes, but would tend to consolidate all the States associated into one political unit.

The Plaintiffs, as citizens of Connecticut who did not vote in any election where any of the other governors hold office or for any of their legislatures (who, for whatever reason, do or do not hold oversight functions), have a clear right to not have their State Government usurped by this Unconstitutional Compact.

### 3. The Defendant was Forbidden from Blockading Plaintiff Barnes' Vessel

The Defendant's acts, open and notorious, have also reopened an issue decided by the United States Supreme Court in *Prize Cases*, 67 U.S. 2 Black 635 635 (1862) – Civil War era precedent that, "Neutrals have a right to challenge the existence of a blockade *de facto,* and also the authority of the party exercising the right to institute it. They have a right to enter the ports..." - of which the Plaintiff must be because the Defendant had no right to close the ports of this State to registered vessels. "War has been well defined to be, "That state in which a nation prosecutes its right by force."The parties belligerent in a public war are independent nations. But it is not necessary, to constitute war, that both parties should be acknowledged as independent nations or sovereign States. A war may exist where one of the belligerents claims sovereign rights as against the other." Id

24

666.

Thus, the act of any State limiting the free movement and passengers from port to port, under implied or actual threat of force by executive order, is a blockade and is an act of war.

F. <u>The Defendant Had No Authority To Act as He Did</u>

None of any of the things complained of are authorized by Connecticut General Statutes §19a-131a or §28-9. As to the previous, these functions and their ancillary functions in §19a-131b and §19a-131e are carried out by the Commissioner of Public Health, who must make factual findings and afford due process – not the Defendant (whose orders usurped that authority). As to §28-9, that statute's language and the entire chapter speak to hostile action (such as war, terrorism or insurrection).

Even assuming, *arguendo*, that some authority existed for some actions taken by the Defendant, the acts complained of in the Verified Complaint still well exceed all due process and constitutional boundaries.

**IV. Conclusion**

It is very clear that the Defendant had no authority to engage in any of the acts complained of in the Verified Complaint. In doing so, he violated the rights of the Plaintiffs in the ways complained of, who will suffer irreperable harm absent injunctive relief. The Plaintiffs have made a showing that they are likely to prevail on the merits.

25

The Defendant has made a showing of his continued will to completely disargard the civil liberties of the Plaintiffs and our constitutional form of government, indeed seeing fit to usurp Federal Powers, carte blance.

Accordingly, injunctive relief should enter.


FOR THE PLAINTIFFS,                    PLAINTIFF DANIEL REALE
SEAN MURPHY
ROBERT BARNES,
/s/ Edward Bona                        /s/ Dan Reale
PO Box 13                              20 Dougherty Ave
Plainfield, CT 6374                    Plainfield, CT 6374
(860) 889-5930                         (860) 377-8047
edward-bona@comcast.net                headlinecopy@gmail.com