**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SEAN MURPHY ET AL., | : | CIVIL CASE NO. |
|     Plaintiffs, | : | 3:20-CV-0694  (JCH) |
| | : | |
|     v. | : | |
| | : | |
| NED LAMONT, | : | |
|     Defendant. | : | AUGUST 3, 2020 |
| | : | |

**RULING ON PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION (DOC. NO. 3) AND PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION (DOC. NO. 17)**

## I.      INTRODUCTION

In response to the COVID-19 pandemic, Governor Ned Lamont ("Governor" or "defendant") issued a series of Executive Orders aimed at slowing the spread of the virus and protecting the health of Connecticut residents.   Plaintiffs Sean Murphy ("Murphy"), Robert Barnes ("Barnes"), and Daniel Reale ("Reale") (collectively, "plaintiffs") bring this action against the Governor to challenge these orders.   See generally Amended Complaint ("Am. Compl.") (Doc. No. 18).

In their six-count Amended Complaint, plaintiffs allege that various Executive Orders issued by the Governor violate their constitutional rights.  Id.  Count One alleges that the Executive Orders violate plaintiffs' substantive and procedural Due Process rights by restricting their movement and impairing their associational liberty interests, id. ¶¶ 40–52; Count Two alleges a First Amendment violation of plaintiffs' liberties of association, speech, assembly, and religion, id. ¶¶ 53–63; Count Three asserts a violation of the Guarantee Clause of Article IV, section 4 of the United States Constitution, id. ¶¶ 64–69; Count Four asserts that the Interstate Agreement and

Compact ("IAC") that Lamont entered into with neighboring states subverts the U.S. and state constitutions, id. ¶¶ 70–77; Count Five asserts that Lamont has violated plaintiffs' First and Fourteenth Amendments by restricting speech based on its political content, id. ¶¶ 78–83; Count Six alleges an unlawful interference with interstate commerce under Article 1, sec. 8 of the United States Constitution, id. ¶¶ 84–91.

Pending before the court is the Plaintiffs' Emergency Motion for Preliminary Injunction (Doc. No. 3) and Plaintiffs' Amended Motion for Preliminary Injunction (Doc. No. 17), in which Motions plaintiffs seek injunctive relief on all counts but Counts Three and Four.[1] Specifically, plaintiffs move this court to enjoin some of the Governor's Executive Orders.  For the reasons stated below, these Motions are denied.

## II.    BACKGROUND

### A.    Factual Background[2]

The 2019 Novel Coronavirus ("COVID-19") is a respiratory illness caused by a coronavirus.  See Frequently Asked Questions, CDC (July 15, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last accessed July 29, 2020). Since the virus was first identified in January 2020, it has swept the globe and infected people in nearly every country.  See World Map, CDC (July 20, 2020), available at

---

[1] In their Surreply, plaintiffs stated that they no longer pursue injunctive relief on Counts Three and Four.  See Plaintiffs' Surreply to Defendant's Supplementary Objection (Doc. No. 30) ("Pl. Surreply") at 2.

[2] The facts are taken from the Amended Complaint (Doc. No. 18); the plaintiffs' Declarations (Docs. No. 22-1, 22-2 & 22-3); and facts of which the court takes judicial notice.  See Fed. R. Evid. 201 (providing that courts may take judicial notice, whether requested or not, of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

Unless otherwise indicated, the court accepts, for purposes of these Motions, the non-conclusory, factual allegations of the plaintiffs' Amended Complaint (Doc. No. 18), and the testimony in the Declarations recounted herein.

https://www.cdc.gov/coronavirus/2019-ncov/global-covid-19/world-map.html (last

accessed July 29, 2020).  As of July 29, 2020, 16.8 million cases have been reported

worldwide, along with 662,648 deaths.  <u>See</u> COVID-19 Dashboard, Johns Hopkins

University, available at https://coronavirus.jhu.edu/map.html (last accessed July 29,

2020).

 COVID-19 is thought to be spread from person to person, mainly through

respiratory droplets produced when an infected person coughs, sneezes, or talks. <u>See</u>

Frequently Asked Questions, CDC (July 15, 2020).  Transmission is therefore more

likely when people are in close contact with one another (within about 6 feet).  <u>Id.</u>  For

this reason, the Centers for Disease Control and Prevention ("CDC") recommends that

people practice "social distancing" and wear cloth face coverings when in public.  <u>See</u>

How to Protect Yourself & Others, CDC (Apr. 24, 2020), available at

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last

accessed July 29, 2020).

 On March 8, 2020, Governor Lamont reported the first case of COVID-19 within

the state of Connecticut.  <u>See</u> Press Release, CT.gov (Mar. 8, 2020), available at

https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/03-

2020/Governor-Lamont-Announces-First-Positive-Case-of-Novel-Coronavirus-Involving-

a-Connecticut-Resident (last accessed July 29, 2020). Two days later, the Governor

declared a public health emergency, which shall remain in effect until September 9,

2020, unless terminated earlier by the Governor.  See Am. Compl. ¶ 6.

 Governor Lamont has issued a series of Executive Orders aimed at containing

the spread of the deadly virus.  On March 12, 2020, the Governor issued Executive

Order 7, which prohibited social and recreational gatherings of 250 people or more. See Executive Order 7 (Mar. 12, 2020).  That Executive Order was superseded by Executive Order 7D (Mar. 16, 2020) (prohibiting social and recreational gatherings of 50 people or more) and again by Executive Order 7N (Mar. 26, 2020) (prohibiting social and recreational gatherings of six people or more).  These Executive Orders also imposed less severe restrictions on religious gatherings.  See, e.g., id. (prohibiting religious gatherings of 50 people or more).  On March 20, 2020, Government Lamont also issued a "Stay Safe, Stay Home" Executive Order, which placed restrictions on all workplaces of nonessential businesses.  Executive Order 7H (Mar. 20, 2020).  Other Executive Orders closed state parks and forests, see Executive Order 7R (Mar. 31, 2020), imposed rules on retail establishments, see Executive Order 7S (Apr. 1, 2020), and required the use of face masks or coverings in public whenever close contact is unavoidable, see Executive Order 7BB (Apr. 17, 2020).

After plaintiffs initiated this action on May 19, 2020, the Governor continued to issue various COVID-19-related Executive Orders.  On May 29, 2020, the Governor issued Executive Order 7TT, which superseded Executive Order 7N and relaxed the restriction on gatherings by permitting social and recreational gatherings of up to ten people.  See Executive Order 7TT (May 29, 2020).  Executive Order 7BBB imposed certain restrictions on travelers returning from states with high infection rates.  See Executive Order 7BBB (June 24, 2020).

B.    Procedural Background

Plaintiffs filed their initial Complaint on May 19, 2020.  See Complaint (Doc. No. 1).  Plaintiffs filed their Emergency Motion for Preliminary Injunction (Doc. No. 3) and

4

Memorandum in Support ("Pl. Mem.") (Doc. No. 3-1) the same day.  The Governor filed his Response on June 8, 2020.  See Defendant's Opposition to Emergency Motion ("Def. Mem.") (Doc. No. 13).  On the same day, the plaintiffs moved to amend their Complaint by adding two new counts.  See Motion to Amend (Doc. No. 14).

On June 9, 2020, the court held a telephone status conference.  See Minute Entry (Doc. No. 16).  During that conference, the court granted plaintiffs' Motion to Amend, and directed the Clerk to docket the Amended Complaint.  Id.; see also Am. Compl. (Doc. No. 18).  The court also ordered the plaintiffs to amend their Motion for Preliminary Injunction to include the specific relief sought (which the original Motion did not include) and to include the two new counts raised in the Amended Complaint.  The plaintiffs filed their Amended Motion the following week, on June 15, 2020.  See Amended Motion for Preliminary Injunction (Doc. No. 17).

On June 26, 2020, the Governor filed his Supplemental Response, which addressed the two new counts in the plaintiffs' Amended Complaint.  See Defendant's Supplemental Memorandum in Opposition ("Def. Supp. Mem.") (Doc. No. 21).  The Plaintiffs filed their reply on July 3, 2020.  See Response to State's Opposition ("Pl. Reply") (Doc. No. 22).

Following plaintiffs' Reply, the Governor filed a Motion to Exclude New Claims and Facts Not Alleged in the Amended Complaint ("Mot. to Strike") (Doc. No. 23).  In that Motion, the Governor asserted that, because the Reply exceeded 10 pages and

introduced new claims and facts, plaintiffs' Reply failed to comply with Local Rule 7(d).[3] See Mot. to Strike at 3. The Governor therefore moved the court to strike the new claims and facts raised in the Reply or, in the alternative, for permission to file a sur-reply brief to address the claims and facts. Id. at 4.

On July 10, 2020, the court held a telephone conference to address the Governor's Motion to Strike. See Minute Entry (Doc. No. 26). At that conference the court granted in part and denied in part Defendant's Motion to Strike. Id. The court disallowed consideration of any claims not pled in the Amended Complaint and granted Lamont permission to file a sur-reply. Id. The court further allowed the plaintiffs an opportunity to respond and clarified that such sur-reply should strictly abide by the requirements of the Local Rules of Civil Procedure. See id. (citing D. Conn. L. Civ. R. 7(d)). These replies were filed on July 21, 2020, and July 24, 2020, respectively. In plaintiffs' Sur-reply, they withdrew Counts Three and Four as a basis for their Motions. See Plaintiffs' Sur-reply (Doc. No. 30) at 2.

On July 29, 2020, the court held a hearing on the Plaintiffs' Emergency Motion for Preliminary Injunction (Doc. No. 3) and Plaintiffs' Amended Motion for Preliminary Injunction (Doc. No. 17), utilizing the social medial platform Zoom.

## III.   STANDING

Before this court considers the merits of plaintiffs' Motions, it must consider whether plaintiffs have standing to bring this action. See All. for Envtl. Renewal, Inc.

---

[3] Local Rule 7(d) provides, in relevant part:

A reply memorandum may not exceed 10 pages. A reply memorandum must be strictly confined to a discussion of matters raised by, and must contain references to the pages of, the memorandum to which it replies.

D. Conn. L. Civ. R. 7(d).

v. Pyramid Crossgates Co., 436 F.3d 82, 85 (2d Cir. 2006).

Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  For a litigation to constitute a "Case" or "Controversy" within the meaning of the constitution, a plaintiff must "establish that [it has] standing to sue."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).  To establish standing, a plaintiff must show (1) an "injury in fact"; (2) a sufficient "causal connection between the injury and the conduct complained of"; and (3) a "likel[ihood]" that the injury will be "redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (U.S. 1992).

The plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing these three elements.  Id.  This burden increases over the course of litigation.  Id.  "When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment."  Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks omitted).  "Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on such mere allegations, [as would be appropriate at the pleading stage] but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true."  Id. (internal quotation marks omitted) (alternations in original).

Standing is based on "whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."  Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons, 954 F.3d 118, 135 (2d Cir. 2020) (emphasis in original).  For this reason, "[e]vents occurring after the filing of the complaint cannot operate so as to

7

create standing where none previously existed." [4]  City of Hartford v. Towns of
Glastonbury, 561 F.2d 1042, 1051 n.3 (2d Cir.1977) (en banc); see also Sharehold
Representative Servs. LLC v. Sandoz Inc., No. 12-CV-6154, 2013 WL 4015901, at *7–
*8 (S.D.N.Y. Aug. 7, 2013) (rejecting the suggestion that an amended complaint could
be used to cure any standing defects in existence when a suit was filed).

Here, plaintiffs have failed to meet this burden as to each of the claims they raise
in the Amended Complaint.

A.    Count One

Count One alleges that the Executive Orders violate plaintiffs' substantive and
procedural Due Process rights by restricting their movement and impairing their
associational liberty interests.  Am. Compl. ¶¶ 40–52.  Plaintiffs lack standing to seek
relief on this claim.  The facts alleged in the Amended Complaint and Declarations[5] are
conclusory and insufficient to establish that the plaintiffs have suffered "an injury-in-fact"
that is "fairly traceable" to the Governor's actions and would be redressed by the relief
they seek.  Lujan, 504 U.S. at 561.  Count One alleges, for example, that "[a]ll Plaintiffs
have been denied the right to conduct their affairs and freely move about without official
permission in publicly accessible spaces, public parks, public lands and to use public

---

[4] In this case, plaintiffs filed an Amended Complaint nearly one month after initiating this action.
Although the court considers the allegations in the Amended Complaint, the standing analysis focuses on
whether plaintiffs had standing when the suit was filed.

[5] These Declarations were filed nearly one month after plaintiffs filed their Amended Complaint.
Therefore, "[t]hese affidavits should not be considered part of the pleadings since they were not attached
as exhibits and since the complaint does not incorporate them by reference." Amato v. Elicker, No. 3:20-
CV-464 (MPS), 2020 WL 2542788, at *7 (D. Conn. May 19, 2020) (citing Cortec Indus., Inc. v. Sum
Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)).  During the telephone conference held on July 10, 2020,
the court stated, however, that it would consider these Declarations insofar as they assert factual
allegations related to claims previously raised in the Amended Complaint.  See Minute Entry (Doc. No.
26).  The court further held that it would not consider claims raised for the first time in these Declarations
or in the plaintiffs' Reply.  Id.

accommodations."  Am. Compl. ¶ 22.  However, such allegations are far too vague to establish an injury-in-fact.  See Lujan, 504 U.S. at 561 (noting that an alleged injury must be "concrete and particularized").

To the extent that plaintiffs allege a deprivation of liberty by being placed on "functional house arrest," Am. Compl. ¶ 28, or "quarantined,"  id. ¶46, such allegations misunderstand the effect of the Executive Orders.  Nothing in Executive Orders 7, 7D, and 7N, which plaintiffs challenge in Counts One and Two, see id. ¶¶ 48, 59, subject plaintiffs (or any other individual) to home confinement or quarantine.  Indeed, plaintiffs have not identified any Executive Order that prohibits their movement.[6]

B.    Count Two

Count Two alleges a First Amendment violation of plaintiffs' rights of association, speech, assembly, and religious worship.  Am. Compl. ¶¶ 53–63.  The Second Circuit has instructed that, "[d]espite the language of Lujan and similar cases . . . [courts] assess pre-enforcement First Amendment claims, such as the ones [plaintiffs] bring[ ], under somewhat relaxed standing and ripeness rules."  Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 690 (2d Cir. 2013).  In such claims, "a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014); see also Cassell v. Snyders, 20-CV-50153, 2020 WL

---

[6] For the first time in their Reply, Plaintiffs claim a violation of their right to travel based on Executive Order 7BBB.  See Pl. Reply at 22–26.  Because this claim was not included in the Amended Complaint, the court will not consider it.  See Minute Entry (Doc. No. 26).  Furthermore, because standing is based on "whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed," Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons, 954 F.3d 118, 135 (2d Cir. 2020) (emphasis in original), this Executive Order—issued more than one month after plaintiffs brought this action—cannot be a basis for standing.  Executive Order 7BBB (June 24, 2020).

2112374, at *5 (N.D. Ill. May 3, 2020) (applying the relaxed standing rules to a pre-enforcement First Amendment challenge of Governor Pritzker's stay at home order).

Even under these "relaxed" rules, the injuries asserted by the individual plaintiffs fail to show that they have standing to assert their First Amendment claims in Count Two.  In his Declaration, Barnes asserts that he is "impeded from attending church." See Declaration of Robert Barnes ("Barnes Decl.") (Doc. No. 22-2) ¶ 6.  However, because no Executive Order prohibits religious worship, Barnes cannot show that the conduct he wishes to engage is "proscribed by statute." Susan B. Anthony List, 573 U.S. at 159.  Furthermore, Barnes alleges no facts as to his intention to attend religious services or any specific occurrence where he was prevented from doing so.  Barnes' allegations as to the violation of his religious liberties is limited to his allegation that he is "impeded from attending church." Barnes Decl. ¶ 6.  This fails to establish that Barnes has suffered a "concrete and particularized" injury.[7] Lujan, 504 U.S at 560.

Murphy also asserts an injury to his religious liberty, along with his freedom of association.  He alleges that, "[b]efore the illegal lock down orders, my family participated in a homeschooling group, in which we met in a church.  We have not met since this lockdown."  Declaration of Sean Murphy ("Murphy Decl.") (Doc. No. 22-1), ¶ 6;

---

[7] Barnes' Declaration, the Amended Complaint, and plaintiffs' briefings do not include any reference to Executive Order 7TT, which, two weeks before plaintiffs filed their Amended Complaint, relaxed the restrictions for religious gatherings as follows:

> Effective immediately, the 49-person limit on religious, spiritual and worship gatherings is raised for indoor gatherings to 25% of capacity of the indoor space or a maximum of 100 people, whichever is smaller, and to 150 people for outdoor gatherings, provided in each case that appropriate safety and social distancing measures shall be employed.

Executive Order 7TT (May 29, 2020).  Barnes does not explain how the Executive Orders impede his ability to attend church in light of the clear language of Executive Order 7TT.  To the extent that services at Barnes' church have been suspended, the court finds that, based on the record before the court, this injury is caused by the decision of a third party, not the Governor.

see also Am. Compl. ¶ 23.  Like Barnes' allegations, these allegations are too vague to establish an injury-in-fact.  First, Murphy provides no facts specifying the size of his religious homeschool group or the dates on which the group would have met absent the Governor's orders.  Further, Murphy does not specify which "illegal lock down orders" he is challenging.  Indeed, no Executive Order prevented homeschool groups from meeting.  On May 5, 2020, Lamont did cancel public schools for the remainder of the 2019-2020 academic year, but only encouraged private schools to do the same.  See Executive Order 7II (May 5, 2020).  Therefore, Murphy complains of the decision of a third party (the religious homeschool group), not the Governor.  Such a claim is insufficient to establish standing.  Lujan, 504 U.S. at 562; see also Henry v. DeSantis, No. 20-cv-80729, 2020 WL 2479447, at *5 (S.D. Fla. May 14, 2020) ("[T]he law does not afford a remedy to Petitioner against the Governor for the response taken by [third parties].").

In the Amended Complaint, Reale also alleges that the Governor's Executive Orders infringe upon his freedom of association.  Am. Compl. ¶ 25.  He alleges that Executive Order 7N "prohibits him from visiting his parents' house because six individuals live in that house" and that the American Poolplayers Association, of which he is a member, is prohibited from hosting games.  Id.  As to the latter claim, nothing precludes Reale from meeting with fellow American Poolplayers Association members in smaller groups.  As to the right of familial association, the court recognizes that the relationship between Reale and his parents "receive[s] the greatest degree of protection because [it is] among the most intimate of relationships."  Patel v. Searles, 305 F.3d 130, 136 (2d Cir. 2002).  However, the pleadings are inadequate to establish that Reale

has suffered an injury-in-fact as to this constitutional right.  Reale has failed to show that

"there exists a credible threat of prosecution" were he to visit his parents.  Susan B.

Anthony List, 573 U.S. at 159 (2014).  Further, nothing precludes Reale from meeting

with his parents in a group of less than six people or from contacting them via

videoconference or from visiting them outside.  Without establishing that Reale has

suffered an injury-in-fact, plaintiffs lack standing to assert this claim.[8]

Reale's other allegations are similarly insufficient to establish that plaintiffs have

standing to seek relief on any of their claims.[9]  In his Declaration, Reale alleges that the

Governor's Executive Orders have "directly resulted" in weight gain.  Declaration of

Daniel Reale ("Reale Decl.") (Doc. No. 22-3), ¶ 5.  However, as to this injury, Reale

does not allege facts to satisfy the second element of standing: a causal connection

between the injury and the complained of conduct.

Reale further alleges that he participates in his municipal budget process and

that the Governor's Executive Orders "gave my Town's Board of Selectman the

---

[8]   Even if the court were to conclude that plaintiffs had standing to assert this First Amendment association claim, it is now moot.  Executive Order 7TT, issued on May 29, 2020, superseded Executive Order 7N, and permits social gatherings of up to 10 people inside and 25 people outside.  See Executive Order 7TT (May 29, 2020).  Under these new regulations, Reale has no basis to assert that he is prevented from visiting his parents' home (where six individuals reside).

In their Reply, plaintiffs argue that none of their claims are moot because the Governor "plans to continue running Connecticut by executive order and engage in all the acts complained of in the amended complaint indefinitely."  Plaintiffs' Sur-reply to Defendant's Supplementary Objection ("Pl. Sur-reply") (Doc. No. 30).  Plaintiffs' characterization of the Governor's "plans" is contradicted by the record evidence, which demonstrates that the Governor has relaxed the restrictions of which plaintiffs complain.

[9] Reale's Declaration raise several allegations related to claims not included in the Amended Complaint.  For example, Reale alleges that Executive Order 7BBB prevented him from attending the National Convention of the Libertarian Party, which took place in May in Orlando, and prevented him from visiting his two children in Louisiana.  Id. ¶¶ 8, 9.  Reale also claims for the first time that he is a plaintiff in a pending state court matter that has experienced delays due to restrictions imposed by the Executive Orders.  Id. ¶ 7.  Because these claims were not raised in the Amended Complaint, the court will not consider them.  See Minute Entry (Doc. No. 26); see also, supra, p. 9 n.6 (noting that, because the standing inquiry focuses on the point at which plaintiffs initiated the action, Executive Order 7BBB, which was issued after plaintiffs filed suit, cannot confer standing).

impression that they could, without Town vote or meaningful assembly (even remotely), pass a budget for the next fiscal year and in fact exceed spending authority in the Town Charter." Id. ¶ 6. Reale does not specify which Executive Order gave the Board of Selectman this impression. Indeed, the court finds that none of the challenged Executive Orders could reasonably give this impression. To the extent that this assertion could be construed as an injury, the court concludes that this also fails to satisfy standing's causation requirement. Like Murphy's claim involving his homeschool group, Reale complains of the conduct of a third party (the Board of Selectman), not the Governor. See Bennett v. Spear, 520 U.S. 154, 169 (1997) (noting that the requirements of standing are not met when "the injury complained of is the result of the independent action of some third party not before the court").

C.    Counts Five

In the Amended Complaint, plaintiffs add two additional counts. However, plaintiffs fail to assert any factual allegations demonstrating that they have standing to bring these claims. In Count Five, plaintiffs allege that the Governor has violated their First and Fourteenth Amendments by imposing content-based restrictions on speech. See Am. Compl. ¶¶ 78, 79. Specifically, plaintiffs allege that the Governor has proscribed and quelled demonstrations related to political speech he opposes, while "waiv[ing] all functional bans on those protesting the death of George Floyd." Id. ¶ 79. These allegations, like the plaintiffs' asserted injuries, are purely speculative and not

based on anything in record.[10]  Plaintiffs do not allege that they have any plans to demonstrate or have been actually prevented from demonstrating.  Plaintiffs only speculate that, had they engaged in speech similar to the George Floyd protests, they "would have been met with rubber bullets, tear gas and crowd control measures up to and including lethal force." Id. ¶ 82.  This speculation is insufficient to establish standing.  See Lujan, 504 U.S. at 560 (observing that standing requires an injury that is "actual or imminent, not conjectural or hypothetical") (internal quotation marks omitted).

Furthermore, plaintiffs allege no causal connection between the Executive Orders that they seek to enjoin and the alleged hypothetical injury.  Plaintiffs identify no Executive Order that restricts political speech based upon its content.  To the extent that plaintiffs identify the government's response to the George Floyd protests as evidence of discriminatory enforcement, these protests occurred after plaintiffs filed suit and therefore cannot establish standing.  See Fed. Defs. of New York, Inc., 954 F.3d at 135 ("Under established standing doctrine, however, we evaluate "whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.") (emphasis in original) (internal quotation marks omitted); see also S. Utah Wilderness All. v. Palma, 707 F.3d 1143, 1153 (10th Cir. 2013) ("[A]lthough we examine the allegations in SUWA's Amended Complaint, our inquiry focuses on whether SUWA had standing when the original complaint was filed in April 2007.").

---

[10] In the Amended Complaint, plaintiffs include a link to the Governor's press conference to support their assertion that the Governor "actively condoned" the demonstrations on Interstate 84.  See Am. Compl. ¶¶ 36, 37.  However, the Governor stated during that press conference that the highway was "not where they [the protestors] should have gone," and that such conduct was "dangerous," and "unsafe."  And contrary to plaintiffs' assertion, arrests were made during these demonstrations.  See Ex. 14 (Doc. No. 21-1).

D.    Count Six

In Count Six, plaintiffs allege an unlawful interference with interstate commerce under Article 1, sec. 8 of the United States Constitution.  See Am. Compl. ¶¶ 84–91.  In particular, plaintiffs allege that the Executive Orders have shuttered restaurants and grocery stores, id. ¶ 85, granted grace periods on auto policies and rental payments, id. ¶ 88, modified Medicare and Medicaid payments and HIPPA requirements, id. ¶ 89, provided immunity to healthcare providers and facilities, id., and prevented Barnes from "engaging in Interstate Commerce on his vessel", id. ¶ 86.  Plaintiffs lack standing to seek relief on Count Six because they have failed to allege any facts establishing an injury-in-fact.  Plaintiffs do not allege that they have been impacted by the closing of restaurants and stores,[11]  the grace periods for auto policies and rental payments,[12] or the modifications to Medicare and Medicaid payments.

To the extent that Murphy makes allegations involving the sale of his home in support of Count Six of the Amended Complaint, these allegations similarly fail to

---

[11] As to the impact of the Executive Orders on stores, the Amended Complaint alleges that they have unfairly impacted smaller stores:

> The Defendant . . . has imposed requirements on retail outlets he has seen fit to deem "essential", requiring the Plaintiffs to walk in a prescribed direction and maintain six feet of distance by operation of Executive Order 7S, and turning each into an ergonomic hellscape in many stores so as to frustrate commerce in small organizations and outlets and lend arbitrary preference to larger retail stores such as Wal-Mart.

Am. Compl. ¶ 34.  The plaintiffs do not allege to own any store or have an interest in the "small organizations" that would be sufficient to establish standing.

Reale alleges that the "ergonomic burdens imposed on smaller stores . . . have forced [him] to do more shopping in Wal-Mart."  Reale Decl. ¶ 5.  Reale further alleges that this has caused him to gain eight pounds. Id.  As previously noted, the court finds that Reale has not established the "causal connection" between this injury and the conduct complained of.  See, supra, p. 12.

[12] Murphy does allege that he rented out his home for three months.  See Murphy Decl. ¶ 5. However, he makes no claim concerning the rental payment "grace period" or allege any facts to suggest that he has been impacted by it in any way.

15

establish plaintiffs' standing. Murphy alleges that "[t]he executive orders have prevented [him] from selling [his] home." Murphy Decl. ¶ 4; see also Am. Compl. ¶ 23. However, Murphy fails to allege facts demonstrating the necessary "causal connection" between the Executive Orders and his inability to complete the transaction, and the likelihood that this injury would be redressed by a favorable decision.[13] See Lujan 504 U.S. at 561. It bears noting that real estate transactions have been designated as "essential" and are therefore exempt from the Executive Orders that plaintiffs challenge. See Essential Businesses, Ex. 2 (Doc. No. 13-2). Based on the record before the court, the court concludes that a causal connection does not exist between the Executive Orders and Murphy's inability to sell his home.

The facts alleged involving Barnes' involvement with his yacht club are similarly insufficient to establish standing. Barnes alleges that his yacht club, in response to the Governor's Executive Orders, prevents more than four club members at a time to use the club-owned launch. Barnes Decl. ¶ 4. The Amended Complaint further alleges that he was "regularly in the habit of taking more than five passengers through ocean waters and otherwise being engaged in international commerce -- which he has been forbidden from doing by the Defendant's executive Orders 7, 7D and 7N." Am. Compl. ¶ 24. However, Barnes does not state on what date he had planned to take five or more people on his boat, or whether he would be able to do so in the absence of the Executive Orders, given that his Certification of Documentation is expired. See Ex. S (Doc. No. 3-20). Without these facts, Barnes' vague allegations do not establish

---

[13] When pressed on this issue at oral argument, plaintiffs' counsel directed the court's attention to Executive Order 7BB, which requires the use of face masks or coverings in public whenever close contact is unavoidable. See Executive Order 7BB (Apr. 17, 2020). The inability of Murphy to sell his home is not "fairly traceable" to this requirement.

standing.   See Lujan, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

The plaintiffs lack standing to bring these claims against the Governor. Accordingly, these Motions must be denied for lack of jurisdiction.   In a case similar to the one at bar, the Southern District of Florida reached the same conclusion.   Henry, 2020 WL 2479447, at *5.  In Henry, the court nonetheless addressed the merits of plaintiff's claim:

> Despite the foregoing, the public interest would be best served with an analysis (though a brief one, at that) on the merits of Petitioner's claim. Further, it would be helpful to Petitioner to understand the reasoning of the Court and the constraints of the applicable law. No one has been immune from the effects of the COVID-19 pandemic; no one has been spared, to at least some degree, the affliction of this disease, whether it be physical health, mental health, or economic health. However, while Petitioner naturally seeks guidance from the courts, this case presents issues to be handled by the government's political branches. She deserves to know why.

Id.  For the same reasons, this court will proceed to address the merits of plaintiffs' Motions for Preliminary Injunction.

## IV.   PRELIMINARY INJUNCTION STANDARD

The nature of a preliminary injunction is "an extraordinary and drastic remedy." Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) (per curiam).  Therefore, injunctive relief is granted where "the legal rights [of the plaintiff] at issue are indisputably clear and even then, sparingly and only in the most critical and exigent circumstances." South Bay United Pentecostal Church v. Newsom, 140 S. Ct.1613,

1613 (2020) (Roberts, C.J., concurring in the judgment denying temporary injunction) (internal quotation marks omitted).

"Ordinarily to obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to 'demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'" Yang v. Kosinski, 960 F.3d 119, 127 (2d Cir. 2020) (quoting Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 143 (2d Cir. 2016)).  "The movant also must show that the balance of equities tips in his [or her] favor."  Id. (internal quotation marks omitted).

And where the movant is seeking to modify the status quo through a "mandatory preliminary injunction", as opposed to seeking a "prohibitory preliminary injunction" to maintain the status quo, "the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits."  Id. (citing Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006).  This heightened standard applies here as the relief plaintiffs seek would suspend existing orders and thus change the status quo.  See N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018).

## V.    DISCUSSION

Plaintiff's claims are unlikely to succeed on the merits.  Over a century ago, in Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 38 (1905), the Supreme Court recognized that "[t]he safety and the health of the people of [the state] are, in the first instance, for that [state] to guard and protect."  The plaintiffs in Jacobson challenged a mandatory vaccination law imposed by the Cambridge, Massachusetts board of health.  197 U.S. at 12-13.  In upholding the statute, the Court observed that

18

the liberties secured by the Constitution do "not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good." Id. at 26. When an epidemic of disease threatens the safety of a community's members, it "has the right to protect itself." Id. at 27. Commensurate with that right is a state's authority "to enact quarantine laws and health laws of every description." Id. at 25 (internal quotations marks omitted). Those laws can, and often do, impose incidental burdens on constitutional rights; however, "Jacobson instructs that all constitutional rights may be reasonably restricted to combat a public health emergency." In re Abbot, 954 F.3d 772, 786 (5th Cir. 2020).

The Jacobson Court further explained that judicial review over a matter affecting welfare can occur "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Jacobson 197 U.S. at 31. The court observed that judicial review is appropriate in "extreme cases," i.e., when the state's police powers are exercised in "an arbitrary, unreasonable manner, or [ ] go so far beyond what was reasonably required for the safety of the public." Id. at 28, 38.

Jacobson remains binding precedent today, and "[c]ourts presented with emergency challenges to governor-issued orders temporarily restricting activities to curb the spread of COVID-19 have consistently applied Jacobson to evaluate those challenges." Bannister v. Ige, No. 20-CV-00305, 2020 WL 4209225, at *4 (D. Haw. July

22, 2020) (collecting cases).   For this reason, this court will apply the Jacobson framework to analyze plaintiffs' claims.

A.   Real or Substantial Relation

The court easily concludes that, based on the record before it, the challenged Executive Orders have a "real or substantial relation" to the public health crisis. Plaintiffs allege that Executive Orders 7, 7D and 7N, which imposed limits on social gatherings, are "arbitrary." Am. Compl. ¶ 47; Pl. Mem. at 10, 14.  To the contrary, the science demonstrates that the limit on gatherings has a real and substantial relation to reducing the spread of COVID-19.  On March 15, 2020, the CDC recommended that large events be cancelled.[14]  See Interim Guidance for Coronavirus Disease 2019, CDC, available at https://stacks.cdc.gov/view/cdc/85893.  The following day, the Governor issued Executive Order 7D, which prohibited gatherings of 50 people or more. Executive Order 7D (Mar. 16, 2020).  CDC guidance also recommend that individuals stay 6 feet away from others to avoid spreading the virus. See Social Distancing, CDC, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.  Executive Order 7N, which superseded Executive Order 7D and prohibited gatherings of 10 people or more, was then issued to answer the "need to enact further mandatory distancing measures" following an increase of COVID-19 infections in Connecticut.  Executive Order 7N (Mar. 26, 2020).  In Amato v. Elicker, the court considered Executive Orders 7, 7D, and 7N, and concluded that they had "a 'real and substantial relation' to the state's goal of curbing the spread of the virus." No. 3:20-cv-464 (MPS), 2020 WL 2542788, *10 (D. Conn. May 19, 2020).

---

[14]  The CDC is the nation's healthcare protection agency.  The court takes judicial notice of CDC's various COVID-19-related postings and guidance.

This court reaches that same conclusion.  Plaintiffs focus largely on Executive Order 7, 7D, and 7N, and only mention other COVID-19-related Executive Orders in passing.  See, e.g., Am. Compl. ¶ 9.  Nothing in the record persuades the court that these Executive Orders are arbitrary or without "substantial relation" to the public health crisis.  In their Reply, plaintiffs challenge the efficacy of wearing masks.  See Pl. Reply (Doc. No. 22) at 10–13.  The studies that plaintiff cite in support of this assertion are 10 years old, do not explicitly study the coronavirus, and do not study the efficacy of masks in preventing outward viral transmission (which has been their primary purpose during this pandemic).  See Ex. NN (Doc. No. 22-20); see also Ex. No. OO (Doc. No. 22-21).  Even more, neither study delivered conclusive findings.[15]  See Ex. NN at 1 ("A larger study is needed to definitively establish noninferiority of no mask use."); see also Ex. No. OO ("None of the studies established a conclusive relationship between mask/ respirator use and protection against influenza infection.").  More recently, the nation's top medical professionals have urged the use of face masks and coverings.  See, e.g., Ex. 20 (Doc. No. 29-3).  Based on the record before the court, the court concludes that Executive Order 7BB, which requires the use of face coverings in public spaces where six feet distance cannot be maintained, has a "substantial relation" to the state's goal of curbing the spread of the virus.

---

[15] Exhibit OO is a review of 17 scientific studies.  See Ex. OO (Doc. No. 22-21) at 1.  Although none of the studies reported a conclusive relationship between mask/respirator use and influenza infection, several studies found that mask/respirator use was "independently associated with a reduced risk of severe acute respiratory syndrome (SARS)."  Id.  Further, based on their review of the 17 studies, the authors do not discount mask and respirator use:

> Some evidence suggests that mask use is best undertaken as part of a package of personal protection especially hand hygiene.  The effectiveness of masks and respirators is likely linked to early, consistent and correct usage.

Id.

The Governor issued the complained-of Executive Orders in reliance on the expertise of the World Health Organization, CDC, and Connecticut Department of Health. See, e.g., Executive Order 7N (Mar. 26, 2020) (noting that the "Centers for Disease Control and Prevention and the Connecticut Department of Public Health recommend implementation of community mitigation strategies to increase containment of the virus and to slow transmission of the virus, including cancellation of gatherings of ten people or more and social distancing in smaller gatherings"). Although plaintiffs object to the actions the Governor took, courts grant wide latitude to elected officials acting under these circumstances. See South Bay United Pentecostal Church, 140 S. Ct. at 1613 (Roberts, C.J., concurring in the judgment denying temporary injunction) ("When those officials undertake[ ] to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad.") (internal quotation marks and citations omitted) (alteration in original). Further, nothing in the record persuades the court that the Governor's actions were inappropriate or ineffective. Indeed, scientific evidence supports the opposite conclusion. See, e.g., "Social Distancing," CDC (May 5, 2020), Ex. 7 (Doc. No. 13-7); see also "CDC Calls on Americans to Wear Masks to Prevent COVID-19 Spread," CDC (July 14, 2020) (citing case studies from the Journal of the American Medical Association and CDC's Morbidity and Mortality Weekly Report). At the very least, the Governor's actions had a "real or substantial relation" to the public health crisis. For this reason, plaintiffs have failed to meet their burden of showing a clear likelihood of success on the merits of this aspect of their claim. Jacobson 197 U.S. at 31.

B.    Fundamental Rights

As to whether the orders are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law," Jacobson, 197 U.S. at 31, for the reasons stated below, the court similarly finds that the plaintiffs have not shown a likelihood of success on the merits.

1.    Procedural due process

In Count One of the Amended Complaint, and at pages 10-15 of their Memorandum, plaintiffs assert that the Governor's Executive Orders restrict their liberty without due process in violation of the Fifth and Fourteenth Amendments.  Specifically, plaintiffs contend that the challenged regulations have "isolated" and "quarantined" them in violation of section 19a-131b and 28-9 of the Connecticut General Statutes and the Fifth and Fourteenth Amendments.  See Am. Compl. ¶¶ 40–52; Pl. Mem. at 10, 14. Sections 19a-131 through 19a-131d of the General Statutes set out Connecticut's isolation and quarantine laws.  Section 28-9 describes the Governor's powers in times of a public health emergency.  After the Governor declares a public health emergency pursuant to section 19a-131, section 28-9 authorizes the Governor to "modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health."  Conn. Gen. Stat. § 28-9(b)(1).

First, the Eleventh Amendment bars plaintiffs' claim that the Governor failed to comply with sections 19a-131b and 28-9 of the Connecticut General Statutes.  See Am.

Compl. ¶ 46. The court lacks jurisdiction over all claims against the Governor based on alleged violations of state law, including alleged violations of sections 19a-131b or 28-9. See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

Second, plaintiffs' procedural due process argument misunderstands the state's statutes and the Executive Orders.  Nothing in the challenged Executive Orders subjects any person to confinement in his or her home or otherwise restricts any person's freedom of movement.  At oral argument, plaintiffs' counsel directed this court's attention to Executive Order 7N.  That Executive Order limits non-religious social gatherings to five people, and religious gatherings to 50 people.  Executive Order 7N (Mar. 26, 2020) ¶ 1.  It also imposes other regulations involving retail operations, restaurants, and education.  See id ¶¶ 2, 3, 7.  Nothing in that Executive Order (or any other Executive Order before this court) subjects any person to quarantine or isolation as set forth in sections 19a-131(6) and (9) of the Connecticut General Statutes.  Thus, plaintiffs have failed to demonstrate that they have been deprived of life, liberty, or property in violation of the Fifth and Fourteenth Amendments.

Even if, assuming arguendo, plaintiffs had established some deprivation of their liberty, they have nonetheless failed to demonstrate lack of process. The Supreme Court has long recognized that an individual's due process rights are not violated by a law of general applicability since "the legislative determination provides all the process that is due." Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982); see also Interport Pilots Agency Inc. v. Sammis, 14 F.3d 133, 142 (2d Cir. 1994) ("Official action

that is legislative in nature is not subject to the notice and hearing requirements of the due process clause.").  Here, the Governor properly issued his Executive Orders pursuant to section 28-9 of the Connecticut General Statutes.  These Executive Orders could be disapproved by a legislative committee as specified in section 28-9(b)(1) or superseded by new law.

### 2.    Substantive due process

Plaintiffs also argue that, because "the government has acted in an arbitrary and capricious manner," the Executive Orders violate their substantive due process rights. See Pl. Mem. at 10.  However, this court has already found that the challenged regulations are not arbitrary.  See, supra, § V(A).  The court concludes that plaintiffs have failed to demonstrate a clear or substantial likelihood of success on the merits of this claim.  See Phillips v. City of New York, 775 F.3d 538, 542 (2d Cir. 2015) ("Plaintiffs argue that New York's mandatory vaccination requirement violates substantive due process.  This argument is foreclosed by the Supreme Court's decision in Jacobson.").

### 3.    First Amendment: freedom of speech and assembly

In Count Two, plaintiffs allege that the challenged Executive Orders violate plaintiffs' First Amendment rights, including their freedom of speech, assembly, and association.   Plaintiffs specifically reference Executive Orders 7, 7D, and 7N, which limit the size of social and recreational gatherings.  See Am. Compl. ¶¶ 54, 59.  Plaintiffs also reference Executive Order 7R, which authorized the Commissioner of Energy and Environmental Protection to limit the public's access to state parks.  See Am. Compl. ¶ 62; see also Executive Order 7R (Mar. 31, 2020).  Plaintiffs have failed to show a likelihood of success on the merits of any of these First Amendment claims.

The case law distinguishes between content-based and content-neutral restrictions on First Amendment activities. Content-based restrictions regulate speech "because of the topic discussed or the idea or message expressed." Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015). Such regulations are subject to strict scrutiny. A regulation is content-neutral if it "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). Content-neutral regulations are subject to the "less stringent test" of intermediate scrutiny, that is, the regulations must be "reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information." Hobbs v. County of Westchester, 397 F.3d 133, 149 (2d Cir. 2005) (internal quotation marks omitted).

In Count Five, plaintiffs seem to assert that the Executive Orders are content-based. See, e.g., Am. Compl. ¶ 79. Plaintiffs allege, for example, that the regulations restrict political speech "so long as [the Governor] does not agree with the content of the demonstration" but has "waived all functional bans on those protesting the death of George Floyd." Am. Compl. ¶¶ 78, 79. However, plaintiffs identify no Executive Order that restricts political speech based upon its content. Indeed, none exists. The challenged regulations are clearly content-neutral.[16]   See Amato, 2020 WL 2542788, at

_____

[16] To the extent that Count Five asserts a content-based First Amendment discrimination claim, or a selective enforcement claim, plaintiffs have failed to show on this record a clear likelihood of success on the merits of these claims. The plaintiffs offer no evidence to support its allegation that the Governor has discriminated against them based upon their speech. Furthermore, nothing in the record supports the plaintiffs' assertion that the Governor encouraged recent protests. Based on the record before the court, plaintiffs have failed to establish a clear likelihood of success on the merits of their First Amendment discrimination claim or selective enforcement claim.

*11 (finding the same).  Executive Orders 7N and 7TT, for example, limit the size of gatherings, and regulate other aspects of daily life, without regard to the message or content of any speech.

Under the appropriate intermediate scrutiny standard, the regulations are "narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication."  Ward, 491 U.S. at 791.  First, the government's interest is significant.  As Jacobson and its progeny make clear, the state has a significant interest, indeed a compelling interest, in limiting the spread of a deadly virus.[17]  Further, the restrictions are narrowly tailored to serve this significant interest.  See Amato, 2020 WL 2542788, at *11.  For example, Executive 7N exempts religious services, private workplaces, and retail establishments.  And the restrictions imposed are temporary.

Finally, the regulations "leave open ample channels for communication."  Ward, 491 U.S. at 791.  As to plaintiffs' freedom of assembly and speech claims, plaintiffs can continue to engage in political speech "online, through media, and by protesting in public on [their] own" or in groups no larger than those allowed under Executive Order 7TT.  Geller v. de Blasio, No. 20-CV-3566, 2020 WL 2520711, at *4 (S.D.N.Y. May 18, 2020) (rejecting a First Amendment claim challenging a similar executive order).  Indeed, Reale stated that he participated in "in-car rallies to protest said order."  Reale Decl. ¶ 13.  The challenged regulations also permit small group, in-person gatherings and large gatherings via videoconferencing or telephone.  See Amato, 2020 WL

---

[17] On May 19, 2020, the day plaintiffs initiated this action, 38,430 COVID-19 cases had been reported in Connecticut, and there had been 3,472 COVID-19-associated deaths.  See COVID-19 Update May 19, 2020, CT.gov (May 19, 2020), available at https://portal.ct.gov/-/media/Coronavirus/CTDPH COVID19summary5192020.pdf?la=en.

2542788, at *11 (rejecting a freedom of association claim challenging Executive Order 7N). Therefore, plaintiffs have failed to make a clear showing of success on the merits of their First Amendment freedom of speech and assembly claims.

4.      First Amendment: freedom of association

Count Two also asserts a violation of plaintiffs' freedom of association.  "The right to intimate association protects the close ties between individuals from inappropriate interference by the power of the state." Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City University of New York, 502 F.3d 136, 143 (2d Cir. 2007) (citing Roberts v. United States Jaycees, 468 U.S. 609, 617–18 (1984)).  The right to intimate association extends only to "certain kinds of highly personal relationships," such as "those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." Roberts, 468 U.S. at 618-19. "To determine whether a governmental rule unconstitutionally infringes on an associational freedom, courts balance the strength of the associational interest in resisting governmental interference with the state's justification for the interference." Chi Iota Colony, 502 F.3d at 143.  To that end, the court assesses:

> (1) the strength of the associational interests asserted and their importance to the plaintiff; (2) the degree to which the rule interferes with those interests; (3) the public interests or policies served by the rule imposed; and (4) the tailoring of the rule to effectuate those interests or policies.

Id.

Applying this test here, the court concludes that plaintiffs have failed to make a clear showing of success on the merits of their First Amendment freedom of association claim.  To the extent that the challenged regulations burden Reale's association with his

28

peers at the American Poolplayers Association, Am. Compl. ¶ 25, or Barnes'
association with fellow members of his yacht club, Am. Compl. ¶ 24, the plaintiffs fail to
allege any facts to suggest that these relationships are sufficiently intimate to implicate
the First Amendment.  See Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte, 481
U.S. 537, 546 (1987) (concluding that the relationship among Rotary Club members
lacked the kind of intimacy that warrants constitutional protection).

      Reale's relationship with his family is sufficiently intimate, and he alleges that
Executive 7N "prohibits him from visiting his parents' house because six individuals live
in that house."  Am. Compl. ¶ 25.  He further alleges that the Executive Orders
prevented the family from meeting together for Easter.  Id.  Although the strength of this
associational interest is strong, the challenged Executive Orders only minimally interfere
with this interest.  Nothing in Executive Order 7N prevented Reale from visiting with his
family in a small group (of five people or less) or meeting with them from a distance.
Executive Order 7TT, which superseded Executive Order 7N, allows gatherings of up to
ten people.  See Executive Order 7TT (May 29, 2020).  Therefore, there is no restriction
on Reale's ability to visit his parents' home.  Furthermore, Executive Order 7TT allows
outdoor gatherings of up to 25 people, thus allowing Reale and his family to meet for
larger family gatherings.  See id.  Any infringement is more than outweighed by the
state's compelling interest in limiting the spread of the virus.  For these reasons, the
plaintiffs have failed to show a clear likelihood of success on the merits of their First
Amendment freedom of association claim.

5.     First Amendment: free exercise of religion

Count Two also alleges that the challenged Executive Orders infringe on plaintiffs' religious liberties.  The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  As the Supreme Court has instructed, however, the "right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion proscribes (or prescribes)."  Employment Div. v. Smith, 494 U.S. 872, 879 (1990).  Neutral laws of general applicability laws are subject to rational basis review.  Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene 763 F.3d 183, 193 (2d Cir.2014).

As with plaintiffs' other First Amendment claims, plaintiffs have not established a clear or substantial likelihood of success on the merits of this claim.  Executive Order 7TT limits attendance of places of worship to 25% of building capacity or a maximum of 100 attendees, whichever is fewer.[18]  See Executive Order 7TT (May 29, 2020).  In South Bay United Pentecostal Church, 140 S. Ct. at 1613, the Chief Justice, in his concurrence in the judgment denying a temporary injunction, found that those same restrictions (in California) did not violate the Free Exercise Clause.  The court reaches the same conclusion here.  The challenged Executive Orders are plainly neutral, and

---

[18] To the extent that plaintiffs contend that Executive Order 7N, which limited religious gatherings to 49 persons, violates plaintiffs' religious liberties, this claim is now moot following Executive Order 7TT. Plaintiffs do not raise any exception to the mootness doctrine that would preserve plaintiffs' challenge to Executive Order 7N.  See Pl. Sur-reply at 2, 3.  However, even if an exception did apply (e.g. the "capable-of-repetition" or "voluntary cessation" exceptions), the court would nonetheless find that, under Jacobson, plaintiffs had failed to show a clear likelihood of success on the merits of this claim.  See, e.g., Calvary Chapel of Bangor v. Mills, No. 20-CV-0156, 2020 WL 2310913 (D. Me. May 9, 2020) (collecting cases upholding more stringent COVID-19-related regulations restricting in-person religious services).

plaintiffs have not proffered any evidence to suggest that the Governor has any animus towards religious organizations.  Indeed, more severe restrictions apply to secular gatherings.  See Executive Order 7TT (May 29, 2020) (allowing up to 100 attendees for indoor religious gatherings and 10 for indoor non-religious gatherings); see also South Bay United Pentecostal Church, 140 S. Ct. at 1613 (noting the same) (Roberts, C.J., concurring in the judgment denying temporary injunction).  The challenged Executive Orders are plainly neutral and generally applicable and the court applies rational basis review.  See Cent. Rabbinical Cong. of U.S. & Canada, 763 F.3d at 193.

Because there is a rational basis between the treatment of religious gatherings under the Executive Orders and the state's interest in preventing the spread of COVID-19, the challenged Executive Orders survive rational basis review.  Therefore, plaintiffs have not shown a clear likelihood of success on the merits of this claim.

     C.    Count Six

In Count Six, plaintiffs claim that the Governor "has Treated them Unequally Under the Law in Regards to their Rights to Engage in Daily Activities Protected by the Fourteenth Amendment insofar that the [Governor] Has Claimed the Right to Regulate Interstate Commerce as Afforded to Congress Under Article I, § 8."  Am. Compl., Count Six.  Plaintiffs allege that the Executive Orders have injured the economy, shuttered stores, granted grace periods on auto policies and rental payments, modified Medicare and Medicaid payments, and prevented Barnes from engaging in interstate commerce on his vessel.  Id. ¶¶ 84–90.

It is unclear whether plaintiffs are asserting a Commerce Clause claim or a substantive due process claim. Regardless, plaintiffs have failed to show a clear likelihood of success on either of these claims.

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const., Art. I, § 8, cl. 3. "Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme Court] ha[s] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338 (2007). "Thus, although the Clause is phrased as an affirmative grant of congressional power, it is well established that it contains a negative or 'dormant' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 208 (2d Cir. 2003) (internal quotations omitted).

The "threshold question" in reviewing whether a statute violates the dormant Commerce Clause is "whether a state or local government is 'regulating." Id. at 208. If a state engages in regulation that "affects interstate commerce, [the court] must next determine whether the regulation discriminates against interstate commerce or regulates even-handedly with incidental effects on interstate commerce." United Haulers Ass'n, Inc., 550 U.S. at 338 (2007). "A local law is discriminatory if it provides for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Id. Furthermore, even if a statute does not discriminate against interstate commerce, "it will nevertheless be invalidated under the Pike

32

balancing test if it imposes a burden on interstate commerce incommensurate with the local benefits secured." Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004) (citing Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).

Here, plaintiffs have not identified any Executive Order that discriminates against interstate commerce. No Executive Order that plaintiffs challenge provide for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Id. Furthermore, plaintiffs have not argued that challenged regulations "impose[ ] a burden on interstate commerce incommensurate with the local benefits secure." Id. Based on the record before the court, the burden is small and the benefit (the health of Connecticut residents) is great. For these reasons, plaintiffs have failed to show a clear likelihood of success on the merits of this aspect of Count Six.

To the extent that Count Six asserts a substantive due process claim, the court has already concluded that plaintiffs have failed to show a clear likelihood of success on the merits of this claim. See, supra, § V(B)2. Furthermore, none of the allegations in Count Six implicate "fundamental rights and liberties . . . deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty," that are protected by the Fourteenth Amendment. Washington v. Glucksberg, 521 U.S. 702, 720-721 (1997). To the extent that Count Six asserts harm to various economic interests, these interests warrant only rational basis review. See F.C.C. v. Beach Comm'ns, Inc., 508 U.S. 307, 313 (1993). The Executive Orders easily pass this test.

Accordingly, the court concludes that, even if plaintiffs did have standing to bring this action, they have nonetheless failed to demonstrate a likelihood of success on any

of their claims, much less a clear likelihood of success.   Mastrovincenzo, 435 F.3d at

89.  The court therefore joins the numerous other federal courts in relying on Jacobson

to reject similar constitutional claims brought by plaintiffs challenging similar COVID-19

restrictions in other states.[19]  See Open Our Oregon v. Brown, No. 6:20-CV-773, 2020

WL 2542861, at *2 (D. Or. May 19, 2020) (collecting cases).

## VI.   CONCLUSION

For the reasons stated above, Plaintiffs' Emergency Motion for Preliminary

Injunction (Doc. No. 3) and Plaintiffs' Amended Motion for Preliminary Injunction (Doc.

No. 17) are denied.

## SO ORDERED.

Dated this 3rd day of August 2020 at New Haven, Connecticut.


  /s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[19] Because the court concludes that plaintiffs have failed to show a clear likelihood of success on the merits of their claim, the court need address the other requirements for a preliminary injunction.