**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SEAN MURPHY ET AL., | : | CIVIL CASE NO. |
| Plaintiffs, | : | 3:20-CV-00694(JCH) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, | : | APRIL 11, 2022 |
| Defendant, | : | |
| | : | |

**RULING ON MOTION TO DISMISS (DOC. NO. 31)**

**INDEX**

I. INTRODUCTION ....................................................................................................... 1

II. BACKGROUND ...................................................................................................... 2

   A. Factual Background ............................................................................................. 2

   B. Procedural Background ....................................................................................... 5

III. LEGAL STANDARD ............................................................................................. 7

   A. 12(b)(1) ............................................................................................................... 7

   B. 12(b)(6) ............................................................................................................... 9

IV. DISCUSSION ........................................................................................................ 9

   A. Mootness ........................................................................................................... 11

   B. Eleventh Amendment ........................................................................................ 13

   C. Standing ............................................................................................................ 14

   D. 12(b)(6) Grounds for Dismissal ....................................................................... 26

      1. Qualified Immunity ....................................................................................... 27

      2. Failure to State a Claim ............................................................................... 32

V. CONCLUSION ...................................................................................................... 32

## I.  INTRODUCTION

This action concerns Executive Orders issued in response to the public health

crisis of the COVID-19 pandemic.  Plaintiffs Sean Murphy ("Murphy"), Robert Barnes

("Barnes"), and Daniel Reale ("Reale") bring this action against Connecticut Governor Ned Lamont ("the Governor"), alleging six counts under section 1983 of title 42 of the United States Code ("section 1983"): (1) violations of the right to substantive and procedural due process under Fifth and Fourteenth Amendments; (2) violations of the First Amendment rights to association, speech, assembly, and religious worship; (3) violations of section 4 of Article IV of the United States Constitution; (4) violations of section 10 of Article I of the United States Constitution; (5) unequal treatment under the Fifth and Fourteenth Amendments; and (6) unequal treatment under the Fourteenth Amendment stemming from the Governor's alleged attempt to regulate interstate commerce.

Now before the court is the Governor's Motion to Dismiss the plaintiffs' Amended Complaint, which the plaintiffs oppose.  See Mot. to Dismiss (Doc. No. 31); Pls.' Opp'n (Doc. No. 36).  For the reasons explained below, the Motion to Dismiss is granted in full.

## II.   BACKGROUND

### A.   Factual Background

The court provides a summary of the well-pleaded allegations as relevant to this Ruling with reference to the plaintiffs' Amended Complaint, as well as other background information.

On March 10, 2020, the Governor declared a State of Emergency in Connecticut in response to the intensifying COVID-19 pandemic.  Am. Compl. at ¶ 6.  In the face of a rising "spread of infections in Connecticut and surrounding states, as well as resulting shortages of personal protective equipment and other supplies that could jeopardize public safety and civil preparedness", the Governor pronounced the State of Emergency "to limit the spread of the COVID-19 coronavirus and protect public safety within

Connecticut."  Id.  The Governor invoked Sections 19a-131a and 28-9 of the

Connecticut General Statutes to authorize his declaration.  Id.

With the State of Emergency in effect, Lamont issued a number of Executive

Orders aimed at containing the spread of the virus.[1]  See Am. Compl. at ¶ 8.  On March

12, 2020, the Governor issued Executive Case Order 7, which prohibited social and

recreational gatherings of 250 people or more but did not prohibit religious gatherings.

See Executive Order 7 (Mar. 12, 2020).  That Executive Order was superseded by

Executive Order 7D (Mar. 16, 2020) (prohibiting social and recreational gatherings or

religious gatherings of 50 people or more) and again by Executive Order 7N (Mar. 26,

2020) (prohibiting social and recreational gatherings of six people or more but

maintaining a higher, 50-person limit on religious gatherings).[2]  On March 20, 2020,

Government Lamont also issued a "Stay Safe, Stay Home" Executive Order, which

placed restrictions on all workplaces of nonessential businesses.  Executive Order 7H

(Mar. 20, 2020).  Other Executive Orders closed state parks and forests, see Executive

Order 7R (Mar. 31, 2020); imposed rules on retail establishments, see Executive Order

7S (Apr. 1, 2020); Executive Order 7F (Mar. 18, 2020); suspended certain statutes of

limitations and court functions, see Executive Order 7G (Mar. 19, 2020); suspended in-

---

[1] The court takes judicial notice of Governor Lamont's public health Executive Orders referenced in the plaintiffs' Amended Complaint and the Governor's Motion to Dismiss because they are "matters of public record", of which both parties have notice.  Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998).

[2] Executive Order 7TT, enacted on May 29, 2020, after the plaintiffs filed their May 19, 2020 Complaint, and which the plaintiffs do not reference in their Amended Complaint, imposed different restrictions on worship gatherings, including limiting indoor religious gatherings to 100 people or 25 percent capacity, whichever was smaller; permitting outdoor religious gatherings of up to 150 people; and allowing unlimited attendance at events where participants remained in their vehicles. See Executive Order 7TT (May 29, 2020).  The same Order limited indoor social and recreational gatherings to 10 people and outdoor social and recreational gatherings to 25 people.  Id.

person meeting requirements for corporate shareholders and municipalities, <u>see</u> Executive Order 7I (Mar. 21, 2020); suspended time limits to respond to Connecticut Freedom of Information Act Requests, <u>see</u> Executive Order 7M (Mar. 25, 2020); permitted municipal bodies to apply for grants upon a finding that the body need act immediately to protect "persons and property", <u>see</u> Executive Order 7S (Apr. 21, 2020); and required the use of face masks or coverings in public whenever close contact is unavoidable. <u>See</u> Executive Order 7BB (Apr. 17, 2020).  The plaintiffs allege that the Governor lacked authority under Sections 19a-131a and 28-9 of the Connecticut General Statutes to issue these Orders.  <u>See</u> Am. Compl. at ¶¶ 9-12, 21.

Moreover, they allege, the Orders prevented the plaintiffs from carrying out their regular activities and conducting their affairs.  <u>See id.</u> at ¶ 13, 22.[3]  As to Murphy, he alleges that the Executive Orders prevented him from selling his home, leading him to rent another home he had purchased at a loss.  <u>Id.</u> at ¶ 23.  Further, Murphy claims he was unable to continue attending his religious home school group as a consequence of Executive Orders 7, 7D, and 7N.  <u>Id.</u>

Murphy's co-plaintiff, Barnes, alleges that he is a member of a yacht club who routinely carried more than five passengers on his boat and "otherwise [was] engaged in international commerce."  <u>Id.</u> at ¶ 24.  Executive Orders 7, 7D, and 7N, as well as the

---

[3] The plaintiffs filed Declarations nearly one month after their Amended Complaint.  <u>See</u> Decls. (Doc. Nos. 35-2, 35-3, 35-4); <u>see also</u> Decls. (Doc. Nos. 22-1, 22-2, 22-3).  In resolving the instant Motion to Dismiss under 12(b)(1), the court may rely on evidence outside the Amended Complaint.  <u>See</u> <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000).  Thus, the court considers the factual allegations and claims in the plaintiffs' Amended Complaint alongside supporting factual allegations in the Declarations.  However, the court will not consider new claims raised for the first time in the plaintiffs' Declarations in support of their Motions for Preliminary Injunction.  <u>See, e.g.</u>, <u>Crichlow v. Fischer</u>, No. 917CV00194TJMTWD, 2017 WL 6459512, at *1 (N.D.N.Y. Dec. 18, 2017) ("Plaintiff cannot amend the Amended Complaint by bringing a motion for a preliminary injunction complaining about subsequent conduct").

Governor's decision to enter into an Interstate Compact with New York, have prevented him from continuing these acts.  Id.  As a further consequence of the Orders, Barnes was unable to attend the nominating convention for the Fifth Congressional District, to which he was a delegate.  Id.  The plaintiffs also allege that they were all "locked . . . out of their regular activities" including worship.  Id. at ¶¶ 13, 59.  In relation to this claim, Barnes asserts in his Declaration that he was "impeded from attending church." Barnes Decl. ¶ 6 (Doc. No. 22-2).

The third plaintiff, Reale, alleges the Executive Orders have prevented him from visiting his parents' house because six people live there.  Id. at 25.  He also alleges that he paid dues to join the American Poolplayers Association, whose games were cancelled on account of the Governor's Orders.  Id.  Further, he alleges he is a candidate for Congress in Connecticut's Second District and is active in town politics, including proceedings related to the town budget which have been forestalled by the Executive Orders.  Id. at 25-26.  In his Declaration, he adds that the Governor's Executive Orders have "directly resulted" in his gaining weight.  See Reale Decl. ¶ 5 (Doc. No. 22-3).  He further claims that quarantine requirements for individuals traveling out of state would impede him from seeing his children, who live in Louisiana.  Id. at ¶ 6.

Finally, all of the plaintiffs also allege that the Governor "allowed numerous gatherings" of demonstrators protesting the death of George Floyd.  Id. at 36.  They allege that these protests took place "in violation of the Executive Orders" and, in some instances, blocked intra- and inter-state commerce.  Id. at 37.

B.    Procedural Background

The plaintiffs filed their original Complaint along with an Emergency Motion for a Preliminary Injunction on May 19, 2020.  See Compl. (Doc. No. 1); Mot. for Preliminary

Injunction (Doc. No. 3).  Subsequently, the plaintiffs amended their Complaint to add two Counts and also amended their Motion for Preliminary Injunction to reflect the new claims.  See Am. Compl. (Doc. No. 18); Am. Mot for Preliminary Injunction (Doc. No. 17).  The parties briefed the Motions and, in the course of briefing, the plaintiffs withdrew their claims for injunctive relief as to Counts Three and Four of their Amended Complaint, which allege, respectively, violations of section 4 of Article IV of the United States Constitution and violations of section 10 of Article I of the United States Constitution.  See Pls.' Sur-Reply at 2 (Doc. No. 30).[4]  The court held a hearing on the Motions on July 29, 2020.  See Minute Entry (Doc. No. 32).

After the hearing, the court issued a Ruling denying the plaintiffs' Emergency Motion for a Preliminary Injunction as well as their Amended Motion for a Preliminary Injunction.  See Ruling on Mots. for Preliminary Injunction (Doc. No. 34).  In its Ruling, the court determined that the plaintiffs lacked standing to bring any of their claims.  See id. at pp. 6-17.  Further, the court addressed the merits of the plaintiffs' claims and determined that they were unlikely to succeed given the Supreme Court's ruling in Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 38 (1905).  Because the Governor's Executive Orders had a "real or substantial relation" to the public health crisis, see Ruling on Mots. for Preliminary Injunction at 20-22 (citing Jacobson, 197 U.S. 11 at 31), and were not "plain, palpable invasion[s] of rights secured by the fundamental law", id. at 23-34 (citing Jacobson, 197 U.S. 11 at 31), the plaintiffs' constitutional claims would fail.

---

[4] The plaintiffs abandon Counts Three and Four in their entirety in their Opposition to the Governor's Motion to Dismiss.  See Pls.' Opp'n at 2.

The plaintiffs filed an untimely Motion for Reconsideration (Doc. No. 35), which the court nonetheless considered and denied.  <u>See</u> Ruling Denying Mot. for Reconsideration (Doc. No. 42).  Reale filed an Interlocutory Appeal of the court's Rulings before the Second Circuit.  <u>See</u> Notice of Interlocutory Appeal (Doc. No. 43). The Circuit determined that Reale's claims for injunctive relief were moot, because the Governor's Executive Orders were no longer in effect.  <u>See</u> Order of the United States Court of Appeals for the Second Circuit Dismissing Appeal as Moot ("Second Circuit Order of Dismissal") (Doc. No. 49).  Accordingly, the Circuit issued a Summary Order dismissing Reale's appeal as moot and directing this court to vacate its prior rulings denying a preliminary injunction and reconsideration.  <u>See id.</u> at 3; Second Circuit Mandate (Doc. No. 53).  The court has done so.  <u>See</u> Orders Vacating Rulings and Terminating Underlying Motions as Moot (Doc. Nos. 50, 51).[5]

In the interim, the Governor filed a Motion to Dismiss the plaintiffs' Amended Complaint for a lack of subject matter jurisdiction and for failure to state a claim.  <u>See</u> Mot. to Dismiss (Doc. No. 31).  The court now turns to the Governor's Motion to Dismiss.

### III.   LEGAL STANDARD

A.   <u>12(b)(1)</u>

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d

---

[5] The court vacated its Preliminary Injunction and Reconsideration Rulings and terminated the underlying Motions as moot prematurely on March 28, 2022, three days before the Circuit issued its Mandate on March 31, 2022.  Thus, the court reenters its Orders (Doc. Nos. 50, 51) here as necessary.

Cir. 2000).  The plaintiff bears the burden of proving the existence of subject matter jurisdiction.  Makarova, 201 F.3d at 113.  In determining whether the plaintiff has met this burden, the court must accept as true all factual allegations in a complaint and draw all reasonable inferences in favor of the plaintiff.  Carter v. HealthPort Techs., LLC, 822 F.3d 47, 57 (2d Cir. 2016); Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).  The court may also rely on evidence outside the complaint in deciding a Rule 12(b)(1) motion. Makarova, 201 F.3d at 113.

The issue of mootness is one of subject matter jurisdiction and may be raised at any point.  See Fox v. Board of Trustees, 42 F.3d 135, 140 (2d Cir. 1994); see also Janakievski v. Exec. Dir., Rochester Psychiatric Ctr., 955 F.3d 314, 319 (2d Cir 2020) ("If, as a result of changed circumstances, a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness.").  Likewise, whether a party has standing to bring a claim is a jurisdictional question. See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005).  Because the elements of standing are "an indispensable part of the plaintiff's case", a plaintiff must allege his standing "with the manner and degree of evidence required at the successive stages of the litigation."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may

suffice" to show a viable injury, "for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  Id.

    B.    <u>12(b)(6)</u>

    To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u>  Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a complaint as true, and draws all reasonable inferences in the non-movant's favor.  <u>See</u> <u>La Liberte v. Reid</u>, 966 F.3d 79, 85 (2d Cir. 2020).  However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." <u>Iqbal</u>, 556 U.S. at 678.

## IV.   DISCUSSION

    When the court issued its now-vacated Ruling on the Motions for Preliminary Injunction, other courts had begun to address claims similar to those raised by the plaintiffs.  <u>See, e.g.,</u> <u>Amato v. Elicker</u>, No. 3:20- cv-464 (MPS), 2020 WL 2542788, *10 (D. Conn. May 19, 2020); <u>Cassell v. Snyders</u>, 20-CV-50153, 2020 WL 2112374, at *5 (N.D. Ill. May 3, 2020); <u>Henry v. DeSantis</u>, No. 20-cv-80729, 2020 WL 2479447, at *5 (S.D. Fla. May 14, 2020); <u>Bannister v. Ige</u>, No. 20-CV-00305, 2020 WL 4209225, at *4 (D. Haw. July 22, 2020).  Now, over two years after the outset of the COVID-19 pandemic, more courts have considered and rejected such claims.  Further, the Connecticut Supreme Court has squarely held that the Governor was "acting within [his]

. . . statutory and constitutional authority" in issuing Executive Orders to contain and mitigate the spread of the pandemic. [6]  See Casey v. Lamont, 338 Conn. 479, 523 (2021).  Federal District Courts in this Circuit have granted Motions to Dismiss section 1983 claims alleging federal constitutional violations arising from the Governor's Executive Orders.  See, e.g., Aldridge v. Lamont, No. 3:20-CV-00924 (KAD), 2020 WL 7773415, at *1 (D. Conn. Dec. 30, 2020) (dismissing plaintiff's just compensation, due process, and equal protection claims on Eleventh Amendment and mootness grounds); Amato v. Elicker, 534 F. Supp. 3d 196, 202 (D. Conn. 2021) (dismissing plaintiffs' assembly, freedom of association, right to pursue a living, and takings claims under the federal and Connecticut constitutions on the grounds of a lack of standing, mootness, the Eleventh Amendment, and, alternatively, failure to state a claim).

In the Motion to Dismiss now before the court, the Governor challenges the Amended Complaint on six grounds: (1) mootness; (2) Eleventh Amendment immunity; (3) lack of standing; (4) absolute legislative immunity; (5) qualified immunity; and (6) failure to state a claim.  See Governor's Mot. to Dismiss at 1 (Doc. No. 31).

---

[6] The court notes that the plaintiffs filed a Notice of Supplemental Authority regarding a Hartford Superior Court decision which, they assert, held "that the Executive Orders . . . were likely in excess of the Defendant's authority."  See Notice of Supplemental Authority (Doc. No. 45) (citing CT Freedom All., LLC v. Dep't of Educ., No. HHDCV206131803S, 2021 WL 1251953, at *1 (Conn. Super. Ct. Mar. 8, 2021).

However, plaintiffs neglected to update this non-controlling, supplemental authority with the Connecticut Supreme Court's controlling decision, in Casey v. Lamont, that the Connecticut Constitution permitted the Governor to issue the Executive Orders. See Casey, 2021 WL 1181937, at *10.  Nor did the plaintiffs inform the court that the CT Freedom Alliance court subsequently granted summary judgment to the defendants because the Governor's acts were "within his rights under the Connecticut Constitution." CT Freedom All., LLC v. Dep't of Educ., No. HHD-CV-20-6131803-S, 2021 WL 2207194, at *2 (Conn. Super. Ct. May 24, 2021).

A.     <u>Mootness</u>

First, the Governor contends that many of the plaintiffs' claims are moot because the challenged Executive Orders are no longer in effect.  "The mootness doctrine is derived from the constitutional requirement that federal courts may only decide live cases or controversies." <u>Irish Lesbian & Gay Org.</u>,143 F.3d at 647.  A case becomes moot when a dispute is "no longer embedded in any actual controversy about the plaintiffs' particular legal right", "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit." <u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 91 (2013) (internal quotation marks and citation omitted).

Here, the Second Circuit has already determined that Reale's claims for injunctive relief are moot.  <u>See</u> Second Circuit Order of Dismissal.  As the Second Circuit held:

> The executive orders that Reale complained of are no longer in effect. The most restrictive of the social gathering rules was Executive Order ("EO") No. 7N, which limited the number of people at social gatherings to five. EO No. 7N was superseded by EO No. 7TT on May 29, 2020, which permitted social gatherings of up to 10 people indoors and 25 people outdoors. Thus, Reale's claim that he could not see his family in April and May 2020 because of the five-person limit is now moot. To the extent Reale claimed his ability to worship was impaired by social gathering limitations, EO No. 10D eliminated all capacity limitations for religious gatherings as of March 19, 2021. Finally, as of May 19, 2021, no store in Connecticut was required to adhere to COVID-19 rules concerning social distancing, directional arrows, or number of patrons. Thus, the restrictions that Reale complained of no longer affect him.

See id. at 2.  The Circuit also held that the "capable of repetition yet evading review"
exception did not apply to Reale's claims, because Connecticut has not reimposed
similar restrictions, despite spikes in COVID-19.[7]  See id. at 2-3.

For the same reasons, Murphy and Barnes' claims for injunctive relief are also
moot.  Both plaintiffs allege harms stemming from Executive Orders 7, 7D, and 7N,
whose relevant restrictions have been lifted.   Capacity limits for gatherings and social
events were lifted as of May 19, 2021.  State of Connecticut, Connecticut COVID-19
Response, https://portal.ct.gov/Coronavirus/Covid-19-Knowledge-Base/Reopen-plan
(last visited Mar. 16, 2022).[8]  Thus, Murphy's claim that he was unable to attend his
home school group is moot, as is Barnes' claim that the Orders prevent him from
attending religious services or carrying more than five passengers on his boat.  See Am.
Compl. at ¶¶ 23, 24; Barnes Decl. at ¶ 6.  Similarly, no Executive Order bars Barnes
from serving as a delegate in the future, to the extent that he seeks to do so.  See
Compl. at ¶ 24 (alleging that Barnes was unable to attend a Congressional nominating

_____

[7] The court notes that in precedential decisions in Agudath Israel of Am. v. Cuomo, 983 F.3d 620,
635 (2d Cir. 2020) and Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63 (2020) (per curiam),
the Second Circuit and the Supreme Court held that those plaintiffs' claims concerning capacity
restrictions on houses of worship were not moot.  However, those cases were decided while the New
York executive orders at issue were still in effect. Indeed, only days before the Supreme Court issued its
decision in Roman Catholic Diocese, New York's governor had indicated that it was a "matter of time"
before all of New York City would face more stringent restrictions. See Roman Cath. Diocese, 141 S. Ct.
at 72 (Gorsuch, J., concurring).  Similarly, in Agudath, the Second Circuit observed that New York's
governor had renewed capacity limits on houses of worship just days after the Supreme Court's Ruling in
Roman Catholic Diocese and less than a month before the Agudath decision. See Agudath 983 F. 3d at
631 n. 16.

Here, however, the circumstances differ from those in Agudath and Roman Catholic.  As the
Second Circuit observed in its Ruling dismissing Reale's claims for injunctive relief, Connecticut's
capacity restrictions for houses of worship were eliminated nearly a year ago, and the Governor has not
reimposed them in spite of recent surges in infections. See Second Circuit Order of Dismissal at 2.

[8] The court may take judicial notice of official guidance interpreting the Governor's executive
orders.  See 100 Orchard St., LLC v. Travelers Indem. Ins. Co. of Am., 542 F. Supp. 3d 227, 229 n. 4
(S.D.N.Y. 2021).

convention due to the Executive Orders).  With respect to Murphy's claim that he was unable to sell his home due to the Governor's Executive Orders, it is unclear which Executive Order Murphy alleges prevented him from selling his home; indeed, real estate transactions were designated as "essential" and exempted from the Executive Orders challenged by the plaintiffs.  See Essential Businesses, Ex. 2 at p. 5 section 10 (Doc. No. 13-2).  However, to the extent that Murphy's claim for injunctive relief could have been construed as meritorious at any point, it is now plainly moot, as the plaintiffs have identified no Executive Order in effect that restricts real estate transactions.

Accordingly, the plaintiffs' claims for injunctive relief are dismissed as moot.

B.    Eleventh Amendment[9]

As to the plaintiffs' claims for damages, the Amended Complaint does not specify whether the plaintiffs bring this action against the Governor in his official or individual capacity.  See generally, Am. Compl.  To the extent that the plaintiffs seek to sue the Governor in his official capacity, their damages claims are barred because "[t]he Eleventh Amendment bars the award of money damages against state officials in their official capacities."  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).  Moreover, their claims for retrospective declaratory relief against the Governor in his official capacity are barred.  See Ward v. Thomas, 207 F.3d 114, 120 (2d Cir. 2000) (declaratory judgment

---

[9] Whether "Eleventh Amendment immunity is a matter of subject matter jurisdiction" is a question that the Supreme Court and the Second Circuit "have not decided." Wisc. Dep't of Corr. v. Schacht, 524 U.S. 381, 391 (1998); State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 77 (2d Cir. 2007). Generally, "[t]he distinction is significant: while [courts] must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under Fed.R.Civ.P. 12(b)(6)", the Second Circuit has "held that, in adjudicating a motion to dismiss for lack of subject-matter jurisdiction, a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." State Emps. Bargaining Agent Coal, 494 F.3d at 77.  However, here, the distinction is not consequential, because even assuming arguendo that the plaintiffs' facts are true as alleged, the Governor is entitled to sovereign immunity insofar as the plaintiffs seek to recover money damages from him in his official capacity, as discussed in this section.

is unavailable where there is no "claimed continuing violation of federal law" or "threat of state officials violating the repealed law in the future" as "[a]ny declaration could say no more than that Connecticut had violated federal law in the past.").  As the Second Circuit held in dismissing Reale's appeal, the Governor's alleged violations are neither ongoing nor likely to recur, as evidenced by the lack of new restrictions imposed during recent COVID-19 spikes.  See Second Circuit Order of Dismissal at 2-3.

The plaintiffs appear to argue in their Opposition that they bring their claims against the Governor in his individual capacity and, thus, the Eleventh Amendment does not apply.  See Pls.' Opp'n at 13-14.  The court agrees that the Eleventh Amendment bars only those claims brought against officials in their official capacities.  See Ford, 316 F.3d at 354.  Thus, the plaintiffs' claims against the Governor are barred by the Eleventh Amendment to the extent that they seek to recover damages from him in his official capacity.

C.    Standing

As another ground for dismissal, the Governor argues that the plaintiffs lack standing to bring their claims for injunctive relief, declaratory relief, or damages against the Governor in either his individual or official capacity.  Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2 U.S. Const. art. III, § 2.  For a litigation to constitute a "Case" or "Controversy" within the meaning of the constitution, a plaintiff must "establish that [it has] standing to sue." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). To establish standing, a plaintiff must show (1) an "injury in fact"; (2) a sufficient "causal connection between the injury and the conduct complained of"; and (3) a "likel[ihood]" that the injury will be "redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561

(U.S. 1992).  As the party invoking federal jurisdiction, the plaintiffs bear the burden of establishing these three elements. Id.

Standing is based on "whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons, 954 F.3d 118, 135 (2d Cir. 2020) (emphasis in original).  For this reason, "[e]vents occurring after the filing of the complaint cannot operate so as to create standing where none previously existed."  City of Hartford v. Towns of Glastonbury, 561 F.2d 1042, 1051 n.3 (2d Cir. 1977) (en banc); see also Sharehold Representative Servs. LLC v. Sandoz Inc., No. 12-CV-6154, 2013 WL 4015901, at *7– *8 (S.D.N.Y. Aug. 7, 2013) (rejecting the suggestion that an amended complaint could be used to cure any standing defects in existence when a suit was filed).  Thus, a plaintiff who suffers an injury after suit is filed cannot establish standing on the basis of that alleged injury, because he could not have held "the requisite stake in the outcome" at the time of filing.  See Carlone v. Lamont, No. 21-871, 2021 WL 5049455, at *3 n. 3 (2d Cir. Nov. 1, 2021) (holding that a plaintiff could not demonstrate standing on the basis of alleged injuries that arose after he filed his complaint).  In this case, plaintiffs filed an Amended Complaint nearly one month after initiating this action.  However, the court must assess the allegations in the Amended Complaint to determine whether the plaintiffs had standing "when the suit was filed."  See Fed. Defs. of New York, Inc, 954 F.3d at 135.

In its now-vacated Ruling on the Motions for Preliminary Injunction, the court determined that the plaintiffs lacked standing as to all counts of the Amended Complaint.  See id. at 8.  At the motion to dismiss stage, however, a plaintiff's burden to

establish standing is less stringent than at the preliminary injunction stage.  See

Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011).  To survive a motion to

dismiss, plaintiffs need only "allege facts that affirmatively and plausibly suggest that

[the plaintiffs have] standing to sue." Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d

140, 145 (2d Cir. 2011).  Thus, the court must consider whether the plaintiffs can

establish standing under this more lax standard.

   As the court discusses below, even given the lower threshold to show standing at

this stage of the litigation, the plaintiffs lack standing to bring their claims.

### a.   Count One

   In Count One, the plaintiffs allege that the Executive Orders violate their

substantive and procedural Due Process rights by restricting their freedom of movement

and association.  See Am. Compl. at ¶¶ 40-52.  However, they fail to plausibly allege an

"injury-in-fact" "fairly traceable" to the Governor's actions.  See Lujan, 504 U.S. at 561.

They offer conclusory allegations that the Governor "isolate[ed] and restrict[ed] their

movement, indefinitely, and impair[ed] their liberty interest to the right of familial and

friendship association, and of commerce and of religious worship." Id. at ¶ 48.  They

add that "barbershops and saloons were closed",  id. at ¶ 51, but do not allege that they

owned or tried to patronize any of the shuttered businesses.

   Moreover, they assert that they were unable to challenge these restrictions

because the Executive Orders closed the state courts.  Id. at ¶ 49.  While "[t]he

constitutional right of access [to the courts] is violated where government officials

obstruct legitimate efforts to seek judicial redress." Whalen v. County of Fulton, 126

F.3d 400, 406 (2d Cir.1997) (emphasis added), the plaintiffs have not alleged that they

attempted to file suit or litigate in state court.  Id. at ¶ 49.[10]  Nowhere in the Amended

Complaint have the plaintiffs "alleged facts that affirmatively and plausibly suggest" that

they have standing to bring their Count One Due Process claims.  See Amidax Trading

Grp., 671 F.3d at 145.

       In their Opposition, the plaintiffs argue that "[t]he Amended Complaint clearly,

precisely and comprehensively pleads [denial of due process] in painstaking detail in

pages 3-11, rendering all areas outside the Plaintiffs' homes part 1984 and part

Stanford Prison Experiment."  Opp'n at 3-4.  However, the pages three to eleven of the

Amended Complaint contain only conclusory allegations that the Governor's actions

"lock[ed] the [p]laintiffs out of their regular activities of free association, worship,

commerce, and political activities" and unlawfully placed them in isolation.  See Am.

Compl. at ¶ 13.  In the absence of more specific factual allegations, these vague claims

do not plausibly allege any actual injury to the plaintiffs.  They also claim that the

Governor issued the Executive Orders "in the absence of any lawful authority to do so."

See Am. Compl. at ¶¶ 7-12 (describing the Executive Orders and the requirements of

Sections 19a-131a and 28-9 of the Connecticut General Statutes).  However, even if

this portion of the Amended Complaint could be construed to allege an injury-in-fact to

the plaintiffs, the allegation would not be plausible, as the Connecticut Supreme Court

has held that the Governor acted "within [his] . . . statutory . . . authority" under Sections

19a-131a and 28-9 in issuing the Executive Orders.  Casey, 338 Conn. at 523.  This

court is bound to apply the Connecticut Supreme Court's decision as to Connecticut

---

[10] The plaintiffs have, of course, brought federal claims in the instant case before this court, which did not close in response to the COVID-19 pandemic.

statutory and constitutional law.  See Huddleston v. Dwyer, 322 U.S. 232, 237 (1944)

("The decision of the highest court of a state on matters of state law are in general

conclusive upon [federal courts]. . . ."); see also  Lander v. Hartford Life & Annuity Ins.

Co., 251 F.3d 101, 119 (2d Cir.2001) ( "we must defer to the [state] [s]upreme [c]ourt on

issues of state law").

Thus, the plaintiffs lack standing to bring their claims in Count One of their

Amended Complaint.

b.   <u>Count Two</u>

In Count Two, the plaintiffs allege violations of their First Amendment rights to

association, speech, assembly, and religious worship.  Am. Compl. at ¶¶ 53-63.  To

establish standing to assert a pre-enforcement First Amendment claim, courts in this

Circuit apply "somewhat relaxed standing . . . rules."  Nat'l Org. for Marriage, Inc. v.

Walsh, 714 F.3d 682, 690 (2d Cir. 2013).  "A plaintiff satisfies the injury-in-fact

requirement where he alleges an intention to engage in a course of conduct arguably

affected with a constitutional interest, but proscribed by a statute, and there exists a

credible threat of prosecution thereunder."  Susan B. Anthony List v. Driehaus, 573 U.S.

149, 159 (2014).

The plaintiffs have not alleged facts to "affirmatively and plausibly suggest" they

have standing to bring their Count Two claim.  Amidax Trading Grp., 671 F.3d at 145.

Specifically, each plaintiff's claims in Count Two fail because no plaintiff has plausibly

alleged both of the first two prongs of standing: (1) "injury in fact" or (2) "causal

connection."  Lujan, 504 U.S. at 561.

First, the plaintiffs vaguely allege that the Governor's acts in issuing the

Executive Orders infringed on their right to religious worship.  See, e.g., Am. Compl. at ¶

18

59; see also ¶ 13 (alleging plaintiffs were "locked out" of activities including "worship"). However, they have offered no plausible allegations that worship was "proscribed by statute." Susan B. Anthony List, 573 U.S. at 159.  No Executive Order, cited in the plaintiffs' Complaint or otherwise, banned religious worship.  At the time this suit was filed on May 19, 2020, Executive Order 7N restricted non-religious gatherings to groups of six or fewer and permitted religious gatherings of groups of fifty. Executive Order 7N (Mar. 26, 2020).  In light of the fact that churches were never closed under any Executive Order at issue, the plaintiffs have failed to plead any plausible facts in support of the cursory allegation that the Executive Orders prevented them from worshipping.  In the absence of any such factual allegations, the plaintiffs have failed to plausibly allege that they have suffered a "concrete and particularized" injury in violation of their religious liberties.  See Lujan, 504 U.S at 560.  The court notes that Barnes attests, in his Declaration, that he was "impeded from attending church."  Barnes Decl. at ¶ 6.  This statement appears in his Declaration in Support of the Motion for a Preliminary Injunction, and not in the Amended Complaint.[11]  Id.  However, considering Barnes' statement as an allegation in support of the defendant's claim that the plaintiffs were "locked out" of worship, Barnes' contention that he was "impeded" from attending church presents no plausible factual allegations that support the inference he was prevented from attending his place of worship, but rather, in effect, restates the plaintiffs' vague worship-lock-out claim.

While the plaintiffs have not alleged facts that affirmatively and plausibly suggest they have standing to bring their claims regarding their right to worship, the court grants

---

[11] See p. 4, n. 3, supra.

the plaintiffs a right to replead in light of the Supreme Court's recognition that restrictions on attendance of religious services may "strike at the very heart of the First Amendment's guarantee of religious liberty." Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63 (2020) (per curiam); see also Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 635 (2d Cir. 2020). This right to replead is to the extent that each plaintiff can state plausible factual allegations supporting an inference that his religious worship was obstructed by the Governor's Orders, e.g. that he sought to attend but that the Executive Order mandated capacity of his place of worship had been met and he was turned away. Further, the right to replead is granted only to the extent that such allegations demonstrate the plaintiffs' standing on a claim for money damages.[12]

To the extent that Barnes alleges a violation of his First Amendment rights on the basis of restrictions on his association with members of his yacht club, see Am. Compl. ¶ 24, he has alleged no plausible facts suggesting an injury stemming from constraints on a relationship of the type protected by the First Amendment. See Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 546 (1987) (concluding that the relationship among Rotary Club members lacked the kind of intimacy that warrants constitutional protection). Insofar as Barnes alleges that his inability to attend the nominating convention for the Fifth Congressional District was a "consequence of the [E]xecutive [O]rders", see Am. Compl. at ¶ 24, he does not plausibly allege causation. While he alleges that he was unable to attend the convention, he does not plead that the convention did not occur, whether in person or virtually. Given that Barnes has not

---

[12] As the court has discussed above, see pp. 11-13, supra, the plaintiffs' claims for injunctive relief are moot given that no Executive Order currently restricts the size of religious gatherings, and none has done so since March 19, 2021, despite surges in COVID-19 cases.

alleged that the convention did not take place, nor has he pled allegations as to when the convention was scheduled or which capacity restrictions were in effect at the time, see id., the Amended Complaint lacks any factual allegations to suggest how the Governor's actions or the Executive Orders prevented Barnes from participating in the convention.  However, the court grants Barnes leave to replead his claim of political association with more specific allegations regarding the nominating convention to the extent that he can plausibly allege standing to assert a claim for damages.[13]

As for Murphy, his allegation that his home schooling group, which met in a church, was unable to continue convening due to the Governor's Executive Orders, (Doc. No. 22-1), fails to plausibly allege standing.  See Murphy Decl. at ¶ 6; Am. Compl. ¶ 23.  None of the Executive Orders referenced by the plaintiffs barred home school groups from meeting, and, indeed, the Governor issued an Order expressly excluding private schools from the mandate that closed public schools.  See Exec. Order No. 7II (May 5, 2020).  Thus, Murphy complains of the decision of a third party (the religious home school group), not the Governor.  Such a claim is insufficient to establish standing where, as here, the plaintiff has not alleged facts that the third party was compelled to act by "determinative or coercive effect" of the defendant's alleged action.  See Lujan, 504 U.S. at 562; Henry v. DeSantis, No. 20-cv-80729, 2020 WL 2479447, at *5 (S.D.

---

[13] The court grants the plaintiffs leave to replead their First Amendment free exercise claims on the basis of Roman Catholic Diocese, 141 S. Ct. at 63 (per curiam) and Agudath, 983 F.3d at 635, in which the Supreme Court and the Second Circuit emphasize the constitutional significance of claims relating to religious liberty.  Neither decision held that claims concerning political speech and association warrant the same consideration as free exercise claims. Nonetheless, the court grants Barnes leave to replead his claim that he was excluded from the Fifth Congressional District's convention out of an abundance of caution and recognition that political speech—while subject to reasonable time, place, and manner restrictions that are content-neutral, serve a significant government interest, and leave open ample alternative channels for communication—is at the core of First Amendment protection.  See, e.g., Hobbs v. Cty. of Westchester, 397 F.3d 133, 149 (2d Cir. 2005).

Fla. May 14, 2020); see also Bennett v. Spear, 520 U.S. 154, 169 (1997).  While the court does not discern sufficient allegations to support Murphy's standing, the court is also unable to identify the exact nature of Murphy's claim based on his cursory allegation. Therefore, in an abundance of caution, the court grants him leave to replead to the extent that he can plausibly allege that the Governor's Executive Orders interfered with his right to free exercise in relation to the home school group.

Finally, Reale's claim—that he was prohibited from visiting his parents' house because six people reside there, see Am. Compl. at ¶ 25—fails to plausibly allege an injury-in-fact.  Reale has not alleged that he could not meet with his parents or his family members outdoors or in groups smaller than six.  Nor has he alleged that he faced a "credible threat of prosecution" if he were to visit with his family.  See Susan B. Anthony List, 573 U.S. at 159 (2014).  Likewise, his allegation that he was barred from participating in games with the American Poolplayers Association fails to plausibly allege an injury-in-fact, as he has not alleged that the Executive Orders barred him from convening with other players in small groups.  Moreover, he has not plausibly alleged that the relationship among members of the Poolplayers Association is of the type protected by the First Amendment.  See Bd. of Directors of Rotary Int'l, 481 U.S. at 546 (holding only certain intimate relationships are constitutionally protected). He has also failed to plausibly allege a causal connection between his alleged weight gain and the Executive Orders.  See Reale Decl. at ¶ 5 (Doc. No. 22-3).  Nor does his allegation that the Executive Orders gave his town's "Board of Selectman the impression they could, without town vote or meaningful assembly (even remotely), pass a budget" and exceed spending authority plausibly allege an injury caused by the Governor's conduct.  See

Reale Decl. at ¶ 5; see also Am. Compl. at ¶ 33 (alleging that "city councils and boards of selectmen may disregard emails and use faulty applications" that prevent the public from having "a meaningful say").  Rather, Reale's claim points to the actions of a third party, the Board of Selectmen. Without any plausible allegations that an Executive Order issued by the Governor caused these acts, Reale's claim does not constitute a plausible allegation that the Governor's actions caused injuries to Reale.  See Bennett, 520 U.S. at 169.

In their Opposition, the plaintiffs reiterate the claims in the Amended Complaint, and assert that "the plaintiffs have all pleaded that they are politically active and have been forbidden from engaging in activity from supporting candidates to local politics." See Pls.' Opp'n at 6.  However, the vague allegation that all of the plaintiffs are engaged in "political activities", see Am. Compl. at ¶ 13, provides no plausible factual basis upon which the plaintiffs can establish standing.  The Amended Complaint contains no further plausible factual allegations as to how Murphy is engaged in politics or how the Executive Orders prevented his participation.  As to the other two plaintiffs, as the court has discussed above, see pp. 20-22, supra, neither Barnes' allegation that he was unable to attend the nominating convention for the Fifth Congressional District, see id. at ¶ 24, nor Reale's allegation that the Board of Selectmen believed they could exceed their spending authority, see id. at ¶ 5, alleges facts that "affirmatively and plausibly suggest" that the plaintiffs have standing to bring their First Amendment claims.  Amidax Trading Grp., 671 F.3d at 145.

Accordingly, the plaintiffs lack standing to bring the claims in Count Two of the Complaint.  However, they may replead as to Barnes' political association or political

speech claim regarding his attendance of the nominating convention, Murphy's claim regarding his home school group to the extent that he asserts a free exercise claim, and all plaintiffs' free exercise claims regarding their exclusion from their places of worship.

c.     Count Five

In Count Five, the plaintiffs allege violations of their First and Fourteenth Amendment rights stemming from content-based restrictions on their speech.  See Am. Compl. ¶¶ 78-79.  They allege that the Governor barred political speech he opposed, but permitted protests in the wake of the death of George Floyd.  Id. at ¶ 79.  The plaintiffs have failed, however, to plausibly allege an injury, as they have not claimed in the Amended Complaint that they attempted to engage in political speech or protest, much less that they were prevented from doing so.  Moreover, to the extent that their allegations concern George Floyd's death and the resulting protests, George Floyd was murdered "on May 25, 2020", see Am. Compl. at ¶ 36, after the plaintiffs filed suit on May 19, 2020.  See Compl. (Doc. No. 1).  These claims, therefore, could not have provided the plaintiffs with the "requisite stake in the outcome when the suit was filed" to plausibly allege standing.  See Fed. Defs. of New York, Inc., 954 F.3d at 135.

While the plaintiffs argue, in their Opposition, that they were "present at a protest of several hundred individuals against the Defendant's lockdown orders" on August 2, 2020, see Pls.' Opp'n at 7, the alleged protest took place nearly three months after the plaintiffs filed suit on May 25, 2020, and almost two months after they filed their Amended Complaint on June 9, 2020.  Thus, the plaintiffs could not have plausibly alleged standing "when the suit was filed" based on their participation in the protest. See Fed. Defs. of New York, Inc., 954 F.3d at 135 (emphasis removed).

Thus, the plaintiffs do not have standing to bring their speech restriction claims in Count Five of the Amended Complaint.

### d.   Count Six

Count Six of the Amended Complaint alleges unlawful interference with interstate commerce under Article 1, section 8 of the United States Constitution.  See Am. Compl. ¶¶ 84-91.  However, the plaintiffs fail to plausibly allege an injury-in-fact for the purposes of this Count.  Although they allege that restaurants, stores, and, in particular, small retailers, were forced to close pursuant to the Governor's Executive Orders, the plaintiffs do not allege that they operated any such businesses.  See id. at ¶ 85. Likewise, the plaintiffs do not allege that they were affected by grace periods on auto policies and rental payments, or modifications to Medicare or Medicaid payments, of which they complain.  Id. at ¶ 89.

Moreover, Murphy's claim that he was prevented from selling his home, see Am. Compl. at ¶ 23, fails to plausibly allege causation, as none of the Executive Orders referenced by the plaintiffs bar real estate transactions.  Indeed, as the court has noted, see p. 13, supra, real estate transactions were designated "essential" and exempt from the restrictions imposed by the Executive Orders.  Thus, no causal connection between the Governor's actions and Murphy's inability to sell his home has been plausibly alleged.

Likewise, Barnes fails to plausibly allege standing on the basis of his claims that his yacht club barred more than four members at a time from using the boat launch, see Barnes Decl. at 4, and that he was "regularly in the habit of taking more than five passengers through ocean waters and being engaged in international commerce . . . ." Am. Compl. at ¶ 24.   Barnes' Certification of Documentation expired on April 30, 2020,

see Doc. No. 3-20, and he offers no plausible allegations that he attempted or planned to take five or more people on his boat after the Governor issued his Executive Orders. Hypothetical, "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." Lujan, 504 U.S. at 564.

The plaintiffs argue, in the Opposition, that the Governor's Orders "dramatically inflict[ ] aggrievement on the [p]laintiffs on a daily basis . . . ." See Pls.' Opp'n at 9. However, they plead no plausible allegations to support this contention.  While they argue that Connecticut's revenue decreased, the hospitality sector suffered, and grocery stores and smaller stores were burdened, see id. at 12, they do not allege as to how or whether the plaintiffs themselves were injured as a result of these circumstances.  They also contend that plaintiff Murphy lost power as a result of Tropical Storm Isaias, see id., but the storm took place in July 2020, after the Complaint was filed in May.  See Murphy Decl. at ¶ 4.  Thus, to the extent that this allegation could be construed to allege an injury-in-fact, no such injury existed "when the suit was filed." See Fed. Defs. of New York, Inc., 954 F.3d at 135 (emphasis removed).

Thus, the plaintiffs lack standing to bring their Count Six claim for unlawful interference with interstate commerce under Article 1, section 8.

D.      12(b)(6) Grounds for Dismissal

Even if each of the plaintiffs' claims were not barred in whole or in part by mootness, Eleventh Amendment sovereign immunity, or lack of standing, the court would likely dismiss the plaintiffs' claims under Rule 12(b)(6) on the ground of qualified immunity.

1.      Qualified Immunity[14]

a.      Non-Free Exercise Causes of Action

To the extent that the plaintiffs seek to sue the Governor in his individual capacity, the Governor has also asserted that he is entitled to qualified immunity.  The doctrine of qualified immunity "is intended to provide government officials with the ability to reasonably . . . anticipate when their conduct may give rise to liability for damages."  Anderson v. Creighton, 483 U.S. 635, 646 (1987) (internal quotation marks and citation omitted). Courts afford government officials qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citation omitted).  If a court determines that a plaintiff's rights were not clearly established, it need not decide whether those rights were violated.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

---

[14] The plaintiffs do not address the Governor's qualified immunity defense in their Opposition. See generally Pls.' Opp'n.

The Governor also argues, without opposition from the plaintiffs, that the Governor is entitled to absolute legislative immunity in connection with his issuing of the Executive Orders. Three district courts in New York have considered whether a governor is entitled to legislative immunity for executive orders issued in response to the COVID-19 pandemic, reaching two different conclusions. Compare Lewis v. Cuomo, No. 20-CV-6316 CJS, 2021 WL 5989783, at *1 (W.D.N.Y. Dec. 16, 2021) (holding that Governor Cuomo was entitled to absolute legislative immunity for issuing Executive Orders to address the COVID-19 pandemic) with Ass'n of Jewish Camp Operators v. Cuomo, 470 F.Supp.3d 197 (N.D.N.Y. 2020) (holding that Governor Cuomo was not protected by absolute immunity for issuing COVID-19-related executive orders) and Lebovits v. Cuomo, No. 120CV1284GLSDJS, 2022 WL 344269, at *6 (N.D.N.Y. Feb. 4, 2022) (same).  While this court finds persuasive the Lewis court's reasoning that such executive orders are both procedurally and substantively legislative and, thus, that they would fall within the scope of "legislative" activities protected by the doctrine of absolute legislative immunity, the Second Circuit has not yet squarely addressed the issue.  See Lewis, 2021 WL 5989783, at *11 (applying the analysis established by the Second Circuit in State Employees Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 89 (2d Cir. 2007)).  Given the split within this Circuit, and because other grounds provide a basis for dismissing the plaintiffs' claims, this court will not reach the question of whether the Governor is entitled to absolute legislative immunity for his Executive Orders.

As the Supreme Court held in <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905), the Constitution entrusts "[t]he safety and the health of the people" to state officials "to guard and protect."[15]  <u>Id.</u> at 28.  Thus, "[u]nder <u>Jacobson</u>, the state may curtail constitutional rights in response to a society-threatening [pandemic] so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'"  <u>Columbus Ale House, Inc. v. Cuomo</u>, 495 F. Supp. 3d 88, 92 (E.D.N.Y. 2020) (quoting <u>Jacobson</u>, 197 U.S. at 31; <u>see also</u> <u>Hogue v. Scott</u>, No. 2:20-CV-218, 2021 WL 6050864, at *4–5 (D. Vt. Dec. 21, 2021).

The plaintiffs' Amended Complaint fails to plausibly allege that the Governor's Emergency Orders bear no "real or substantial relation" to the public health crisis of the COVID-19 pandemic.  <u>See</u> <u>Jacobson</u>, 197 U.S. at 31.  Indeed, a growing consensus among district courts in this Circuit recognizes that restrictions like those in the Governor's Executive Orders withstand challenges on constitutional grounds.  <u>See, e.g.</u>, <u>Amato v. Elicker</u>, 534 F. Supp. 3d 196, 211 (D. Conn. 2021); <u>Hogue</u>, 2021 WL

---

[15] Non-merits orders from the Supreme Court over the course of the pandemic, while not binding, have suggested that courts should grant wide latitude to elected officials acting under these circumstances.  <u>See</u> <u>South Bay United Pentecostal Church</u>, 140 S. Ct. at 1613 (Roberts, C.J., concurring in the judgment denying temporary injunction) ("When those officials undertake[ ] to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad.") (internal quotation marks and citations omitted) (alteration in original);  <u>Andino v. Middleton</u>, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring in the judgment granting stay) (same); <u>Democratic Nat'l Comm. v. Wisconsin State Legislature</u>, 141 S. Ct. 28, 32 (2020) (Kavanaugh, J., concurring in the judgment denying application to vacate stay) ("a State legislature's decision either to keep or to make changes to election rules to address COVID–19 ordinarily should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." (internal quotation marks and citation omitted)).

While these concurrences are not precedent and do not bind this court, they help inform the court's approach in weighing the Governor's response to the public health emergency of COVID-19 against constitutional liberties, except to the extent they have been rejected with regard to religious claims.  <u>See</u> <u>Roman Catholic Diocese of Brooklyn v. Cuomo</u>, 141 S. Ct. 63 (2020) (per curiam).

6050864, at *4–5 (collecting cases); Daniel Jean Lipsman v. Lorraine Cortes-Vasquez,
No. 21-CV-4631 (JMF), 2021 WL 5827129, at *2 (S.D.N.Y. Dec. 7, 2021); Jones v.
Cuomo, 542 F. Supp. 3d 207, 224 (S.D.N.Y. June 3, 2021); Aviles v. Blasio, No. 20 CIV.
9829 (PGG), 2021 WL 796033, at *18 (S.D.N.Y. Mar. 2, 2021).

As the Hogue court recently held, "the consistency of these holdings makes plain
that [the Governor] did not violate clearly established federal law" in enacting Executive
Orders in response to the life-threatening pandemic.  Hogue, 2021 WL 6050864, at *4–
5 (discussing Executive Orders issued by the Governor of Vermont).  Because the
Governor "acted in response to a public health emergency", "the constitutionality of his
actions must be viewed within that context."  Id.  (citing Jacobson, 197 U.S. at 38).  In
the midst of an unprecedented public health crisis, "it is not clear that [the Governor]
had fair warning that the [executive orders] violated Plaintiffs' rights, if they in fact do
so."  See id. (alterations in original) (quoting Northland Baptist Church of St. Paul,
Minnesota v. Walz, 530 F. Supp. 3d 790, 807 (D. Minn. 2021)).

For the reasons stated above, qualified immunity bars the plaintiffs' claims for
money damages as to their claims against the Governor in his individual capacity, with
the exception of their claims alleging violations of the First Amendment right to free
exercise

b.    Free Exercise Claims

This court treats First Amendment free exercise claims differently in light of
developments in case law since the plaintiffs' filing of this action.  Namely, the Second
Circuit has made clear that Jacobson does not apply to free exercise claims.  See
Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 635 (2d Cir. 2020) (expressly declining
to apply Jacobson to free exercise claims arising from New York's Executive Orders

restricting occupancy to 10 people in red zones and 25 people in orange ones); see also Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63 (2020) (per curiam) (not applying Jacobson to assess free exercise claims, but not expressly discussing whether Jacobson could apply); see also id. at 69 (Gorsuch, J., concurring) (stating that Jacobson did not apply to the free exercise claims at issue, and casting doubt on its general applicability to constitutional claims); see also id. at 72 (Kavanaugh, J., concurring) (quoting South Bay, 590 U. S., at ——, (Roberts, C.J., concurring) (quoting Jacobson for the proposition that "[t]he Constitution "principally entrusts the safety and the health of the people to the politically accountable officials of the States'", but explaining restrictions must be "tailored to the circumstances given the First Amendment interests at stake")).  Jacobson remains binding upon this court as to the plaintiffs' claims that do not concern the right to free exercise.  See, e.g., Hopkins Hawley LLC v. Cuomo, 518 F. Supp. 3d 705, 713 (S.D.N.Y. 2021) (discussing Jacobson's inapplicability to free exercise claims but applying Jacobson's framework to assess claims in which the free exercise clause was not at issue); see also Butler v. City of New York, No. 20 CIV. 4067 (ER), 2021 WL 4084501, at *5 (S.D.N.Y. Sept. 8, 2021) ("the majority of courts in this Circuit—along with several courts in other circuits—have limited Roman Catholic Diocese to First Amendment free exercise challenges") (collecting cases in this and other circuits).  However, in light of the Second Circuit's Ruling in Agudath and the Supreme Court's Ruling in Roman Catholic Diocese, it is now clear that the deferential standard of Jacobson does not apply to free exercise claims.

At the time the Governor issued the challenged Executive Orders, though, whether Jacobson's deferential standard applied and whether his Orders violated the

plaintiffs' right to free exercise was not clearly established.  The Second Circuit did not

issue its decision in Agudath until December 28, 2020, and Roman Catholic Diocese

was issued on November 25, 2020, after the plaintiffs filed both their Original and

Amended Complaints challenging the Governor's Executive Orders, which were issued

in March and April of 2020.  Furthermore, the Second Circuit made clear that "the First

Amendment does not categorically exempt houses of worship from government

regulation." Agudath Israel of Am., 983 F.3d at 636  (citing Roman Cath. Diocese, 141

S. Ct. at 74 (Kavanaugh, J., concurring) ("In light of the devastating pandemic, I do not

doubt the State's authority to impose tailored restrictions—even very strict restrictions—

on attendance at religious services and secular gatherings alike.")).

      In the face of a pandemic, the Governor issued Executive Orders which limited

public gatherings, including those at houses of worship, reducing in-person contacts in

an edict that bore "real or substantial relation" to the public health crisis.  Jacobson, 197

U.S. at 31.  While it is now plain, in light of Agudath and Roman Catholic Diocese, that

some such restrictions are unconstitutional even in the event of a deadly pandemic, it

was not clearly established at the time of the Governor's issuing of the Executive Orders

that fifty-person capacity limits constituted invasions of the plaintiffs' rights "beyond all

question."  See Jacobson, 197 U.S. at 31.  Thus, whether the Governor's issuing of the

challenged Executive Orders violated the plaintiffs' right to free exercise was not "clearly

established at the time" he did so.  Wesby, 138 S. Ct. at 589.  Because the

unlawfulness, if any, of the Governor's actions in enacting the Executive Orders was not

"clearly established" at the time he did so, qualified immunity would bar all of the

plaintiffs' claims for money damages against the Governor in his individual capacity, including those related to the right to free exercise.

### 2.    Failure to State a Claim

The Governor has also moved to dismiss the plaintiffs' claims for failure to state a claim under Rule 12(b)(6).  <u>See</u> Mot. to Dismiss at 1.  Having determined that all of the plaintiffs' claims should be dismissed, the court need not reach the question of whether the plaintiffs' claims are plausibly pled.

## V.    CONCLUSION

For the foregoing reasons, the Motion to Dismiss (Doc. No. 31) is granted and all counts of the plaintiffs' Amended Complaint are dismissed.  All claims for injunctive relief are dismissed for mootness.  The plaintiffs' claims for injunctive relief, declaratory relief, and monetary damages are dismissed for lack of standing.  All claims for money damages against the Governor in his official capacity are also dismissed on the ground of Eleventh Amendment sovereign immunity.  Moreover, even if the foregoing grounds did not justify dismissal, the court would likely dismiss the plaintiffs' claims for money damages against the Governor in his individual capacity on the ground of qualified immunity.

The court grants Barnes leave to replead his First Amendment claim in Count Two as it relates to his participation in the nominating convention for the Fifth Congressional District.  Murphy is also granted leave to replead his claim in Count Two that his home school group was barred from meeting insofar as he asserts a violation of his right to free exercise.  Also, all the plaintiffs are permitted to replead as to their free exercise claims related to the effect of the Executive Orders on their right to worship.

The court grants the plaintiffs leave to replead these claims only insofar as they can plausibly allege violations consistent with the analysis in this Ruling.[16]

**SO ORDERED.**

Dated at New Haven, Connecticut this 11th day of April 2022.

_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

---

[16] The court does not dismiss any of the plaintiffs' claims on the grounds of qualified immunity, as it lacks jurisdiction to do so after dismissing on 12(b)(1) grounds.  See, e.g., Carlone, 2021 WL 5049455, at *4 n. 4.  However, if the plaintiffs choose to replead any claims as permitted by this court, and if the plaintiffs plausibly allege standing, the court will likely consider whether qualified immunity bars those claims as discussed in this Ruling.  See pp. 27-32, supra.